Aycock, *et al.*, *vs.* Martin, *et al.*

---

[No. 1.]

WILLIAM L. AYCOCK, sheriff, plaintiff in error, *vs.* WILLIAM N. MARTIN, administrator, etc., defendant in error.

[No. 2.]

JOHNSON F. CUNNINGHAM, sheriff, plaintiff in error, *vs.* WILLIAM A. CALCLOUGH, defendant in error.

[No. 3.]

ALEXANDER B. HENDRY, plaintiff in error, *vs.* JOHN McK. GUNN, sheriff, defendant in error.

[No. 4.]

PETER A. HEARD, and TOWNS, sheriff, plaintiffs in error, *vs.* A. B. JONES, executor of JOEL D. NEWSOM, defendant in error.

The obligation of a contract is a *legal* not a mere *moral* obligation ; it is the law which exists at the time the contract is made, which binds a party to perform his undertaking.     The obligation does not inhere in the contract itself *proprio vigore*, but in *the law applicable to the contract.*  The act of 13th December, 1866, commonly known as the stay-law, held to be unconstitutional and void, on the ground that it impairs the obligation of contracts within the prohibition of the constitution of the United States, and the constitution of the State of Georgia.                                                    WARNER, C. J.

HARRIS, J., concurs in the above, and decides further :
That the 4th section of said act is an interference with the execution of the judicial process of the Courts by the officers of the Courts, and is therefore violative of those clauses of the constitution of Georgia distributing the powers of the government among the three departments thereof, and prohibiting the exercise by the Legislature of any of the powers belonging to the Judiciary.   And further; that the Legislature has no power to alter or modify any judgment of the Superior Courts of this State, or by law to arrest or suspend the enforcement of such judgments.                  ·                                    HARRIS, J.

A stay-law is constitutional.                    WALKER, J., dissenting.

Stay-laws.   No. 1 by Judge MILNER, in Bartow Superior Court, September Term, 1866.   No. 2 by Judge WILLIAM M. REESE, Oglethorpe Superior Court, April Term, 1867. No. 3 by Judge CLARKE, Randolph Superior Court, May

Aycock, *et al.*, *vs.* Martin, *et al.*

Term, 1867.   No. 4 by Judge WARNER, Troup Superior Court, May Term, 1867.

## [No. 1.]

Aycock, as sheriff, was ruled for not making the money on a *fi. fa.* (issued upon a mortgage made the 7th day of May, 1859, for $790.00 principal, $406.00 interest and costs).   He showed for cause, that the stay-laws prevented a levy.    The Court held this showing insufficient, and granted a rule absolute against him, and he excepted.

## [No. 2.]

Calclough held a judgment against Burnett Moore, obtained in 1860.   In 1865 the *fi. fa.* thereon was levied on land. In three days after this levy, Calclough's attorney, thinking the levy was void by the stay ordinance, had the same dismissed. In .October, 1866, the plaintiff made affidavit that the executrix of Moore, (who was then dead,) " has since the issuing of said *fi. fa.*, to-wit, on or about the first day of January, 1866, removed property which was and still is subject to said *fi. fa.*, to-wit, sixteen bales of cotton worth $2,000.00, and one horse worth $100.00, the said removal having been to points beyond the boundaries of the county of Oglethorpe."

This affidavit was delivered to the sheriff on the 18th of October, 1866, with instructions to make the money on the *fi. fa.*

On the 31st October, 1866, the executrix made her affidavit .that "she did not, on or about the 1st January, 1866, remove any property, as said Calclough has sworn in his affidavit," and that "she has never moved any other property at any time with fraudulent intent, nor to avoid the payment of her just debts as executrix as aforesaid."

She also filed the affidavit of poverty, authorized by the stay act of March, 1866.

Upon a rule against Cunningham to show cause why he had not collected the money, etc., he showed the facts aforesaid and nothing more.   The Court granted a rule absolute against him, requiring him to pay plaintiff his money due on said *fi. fa.*

[No. 3.]

Hendry brought two actions of trespass, one against Gunn, and the other against Gunn and one Brooks. The alleged trespasses were the levy of *fi. fas.* against Hendry, on his property, which *fi. fas.* were bottomed on notes made in 1863, and which he averred were stayed by law.

These two actions were demurred to and by consent argued together. The demurrers were sustained, and plaintiff excepted.

[No. 4.]

Joel D. Newsom obtained a judgment upon a promissory note, against Peter A. Heard, and therefrom was issued a *fi. fa.*, returnable to May Term, 1863, of the Superior Court of Troup county. Newsom died, and Jones became his executor. The sheriff did not make the money on the same, because of "the stay-law."

Upon this being brought to the attention of the Court at May Term, 1867, by a rule against the sheriff, the following order was passed :

"JOEL D. NEWSOM *vs.* PETER A. HEARD.

"*Fi. fa.* returnable to Troup Superior Court. May Term, 1863. Principal $1,238.50 ; interest to judgment $164.23.

"On motion of counsel for Andrew B. Jones, executor of Joel D. Newsom, the plaintiff, it is ordered that the sheriff do proceed to raise the money on the above *fi. fa.*, as required by the terms thereof, and that he make return of his actings and doings thereon to the next term of this Court."

The plaintiff in error says this order was wrong because of the statute of 13th December, 1866, known as the stay-law, and brings it up for review.

Nos. 1 and 2 were argued at June Term, 1867, and held under advisement. Judge WARNER having decided the Jones case below, and being Chief Justice when Nos. 2 and 4 were heard, the Judges agreed that instead of writing out opinions *seriatim* in each case, WARNER, C. J. should write out the opinion of the Court in No. 4, that HARRIS, J. should write out the opinion in the others, and that WALKER, J. should dissent in one opinion applicable to all.

WOFFORD, PARROTT & COXE, in No. 1, MATHEWS & REID, in No. 2, H. FIELDER, in No. 3, B. H. BIGHAM, in No. 4, for plaintiffs in error.

WARREN AKIN, in No. 1, LINTON STEPHENS in No. 2, A. HOOD, in No. 3, B. H. HILL, in No. 4, for defendants in error.   Others appeared *pro* and *con*, but their names are not shown by the dockets.

WARNER, C. J.

The question made by the record in this case, involves the constitutionality of the act of the Legislature passed on the 13th December, 1866, commonly known as the "stay law." The Constitution of the United States declares that "no State shall pass *any law*, impairing the *obligation* of contracts." The Constitution of the State of Georgia declares, that "*ex post facto* laws, laws impairing the *obligation* of contracts, and *retroactive* laws, injuriously affecting *any right* of the citizen, are prohibited." The Constitution of the State of Georgia further declares, that "legislative acts in violation of the Constitution are *void*, and the judiciary shall so declare them." Thus it will be seen, that if the act of 13th December, 1866, is in violation of the Constitution of the United States, and the Constitution of the State of Georgia, or either of them, then this Court is bound so to declare, by its judgment, under the most solemn obligations that can be imposed ; indeed, it has no discretion in the matter but to obey the stern mandate of the supreme law of the land.

The first inquiry, therefore, which is presented for our consideration and judgment is, does the act of the Legislature of the 13th December, 1866, impair the obligation of the contract between the parties in this case, as prohibited by the Constitution of the United States? The Constitution, it will be perceived, does not prohibit the States from passing laws impairing *contracts*. The prohibition is expressly directed against laws which impair the *obligation* of contracts. What is the *obligation* of a contract as contemplated by the Consti-

tution ?  " The obligation of a contract is a *legal,* not a mere *moral* obligation : it is *the law which binds a party to perform his undertaking.*    The obligation does not inhere or subsist in the contract itself, *proprio vigore,* but in the *law applicable to the contract."*    1st Bouvier's Law Dictionary, 652, and authorities there cited.    When the parties entered into the contract now before the Court which the plaintiff seeks to enforce, what was the *legal obligation* of the defendant ?  His legal obligation was, to do and perform, just what the laws of the land, applicable to the contract, required him to do and perform, at the time the contract was made, in accordance with its terms and stipulations : that was the exact measure of his *legal obligation* at the time the contract was made ; nothing more, nothing less.    The defendant's legal obligation was to perform his contract, as the laws of the land, applicable to that contract, required him to perform it, *at the time it was made.*    That was the extent of his *legal obligation* to the plaintiff, and just to that extent the plaintiff had the *legal right* to have it performed, in order to maintain the *integrity of the legal obligation* of the defendant's contract.    If it was not the existing law of the State, applicable to the contract at the time it was made, which created and defined the defendant's legal obligation to perform it, in accordance with its terms and stipulations, what is it that *does create and define his obligation to perform it ?*    If there had been no *existing law* applicable to the contract, prescribed by the supreme power of the State, at the time it was made, creating and defining the defendant's obligation to perform it, then he would have incurred no other than a mere *moral* obligation, over which human tribunals have no jurisdiction.    It therefore necessarily follows, that the *existing law* applicable to the contract, prescribed by the supreme power of the State, at the time the contract was made, creates and defines the defendant's legal obligation to perform it, in accordance with its terms and stipulations.    " *A perfect right* is that which is accompanied by the *right of compelling* those who refuse to fulfil the correspondent obligation.    *A perfect obligation* is that which gives to the opposite party the *right of compul-*

*sion.*"   Vattel, 62.   The defendant's obligation to perform his contract in accordance with its terms, was a *perfect obligation,* because the plaintiff, at the time the contract was made, had the legal right, under the *then existing law* of the State, to have *compelled* its performance.   The defendant's obligation to perform his contract was just what that *existing law* made it, just what that existing law required, and would have *compelled* to be done for its performance, in behalf of the plaintiff, the other party to it.   The defendant's obligation to perform his contract, under the then existing law, was *perfect,* and the plaintiff's right to have that obligation performed as prescribed by that existing law, was also a *perfect right.*

Having shown that the defendant, by the terms and stipulations of his contract, had imposed upon himself a *perfect legal obligation* to perform it, and that the plaintiff had a *perfect legal right* to have that legal obligation performed in accordance with the existing law, which created and defined that obligation, let us now inquire what acts of the Legislature will *impair* the legal obligation of contracts within the constitutional prohibition ?   In the case of the Justices of the Inferior Court, of Morgan county, vs. Sparks *et al.,* (6th Ga. R., 439,) this Court have answered the question in the most explicit terms.   The Court say in that case " the objection to a law on the ground of its impairing the obligation of a contract does not depend on the extent of the change which the law may make in it.   Any deviation from its terms, by *postponing* or accelerating the period of performance which it prescribes, or imposing *conditions* not expressed in the contract or *dispensing* with the performance of those which are, however minute or apparently immaterial in their effect upon the contract of the parties, *impairs its obligation* and, consequently, is within the constitutional prohibition."   Although the constitutionality of the stay-law was not involved in that case, yet the legal rule, applicable to acts of the Legislature, *impairing* the obligation of contracts was correctly stated, and was again reiterated in Winter vs. Jones, 10th Ga. R., 195. We have endeavored to show what was the extent of the de-

10

fendant's legal obligation to the plaintiff at the time the contract was made. We have shown what is *the rule of law*, applicable to this particular class of cases, as asserted and recognized by this Court. Now let us examine the act of the 13th December, 1866 and see whether according to the rule recognized by this Court, (as well as all other Courts where the laws of the land are independently and impartially administered) that act *impairs* the legal obligation of the contract between the parties in this case? The act is declared to be "An act for the relief of the people of Georgia, and to prevent the levy and sale of property under certain circumstances." The 1st section of the act declares " that there shall be no levy and sale of property of defendants in this State under any execution founded on any judgment, order or decree of any Court, heretofore or hereafter to be rendered upon any contract or liability, made or incurred, prior to the 1st of June, 1865, or in renewal thereof, though bearing a subsequent date, except in the following manner : For one-third of the principal and interest due on said execution and no more, which may be levied on or after the 1st of January, 1868, one-third of the whole on or after the 1st of January, 1869, and the remaining one-third on or after the 1st of January, 1870, unless the defendant shall endorse on the execution, a waiver of the benefit of this act." The 4th section of the act, further declares, " that any officer, or other person, violating this act shall be guilty of *trespass*, and liable to the defendant, or person injured, in damages, not less than the amount of the judgment, order or decree upon which he is proceeding, as in *other cases of trespass*." The existing law of this State, at the time the contract was made between the parties, on which this judgment and execution is founded, and which the plaintiff is seeking to enforce, imposed the legal obligation upon the defendant to perform it, in accordance with its terms and stipulations. That legal obligation was in full force and binding upon him, on the 13th day of December, 1866, when the act in question was passed. Does the act of the 13th of December, 1866, *postpone* the performance of *that legal obligation?* If it does, then in the explicit words of this Court,

before cited, it *impairs the legal obligation of the contract.* Does the act of 1866 impose *conditions* upon the parties, not expressed in the contract, or *in the law*, applicable to the contract *at the time* it was made? If it does, then, according to the same authority, it *impairs the legal obligation of the contract.* Does the act of 1866, *dispense* with the performance of any part of the legal obligation of the defendant to perform his contract, as that legal obligation existed, under the law, at the time of its enactment? If it does, then, according to the well-established rule of law, recognized and declared by this Court, in the two cases before cited, it *impairs the legal obligation of the contract.*

Now, in what manner, does the act of 1866 *impair* the legal obligation of the defendant's contract? At the time of the passage of that act, the defendant's *legal obligation* to pay the debt, included in the judgment, was upon him in all its force and effect, as the same existed under the law, *at the time the contract was made.*

Now, by the act of 1866, he is *relieved* from the performance of that legal obligation, until the first day of January, 1868, *absolutely* and for two-thirds, thereof, until the first day of January, 1869, and for one-third thereof, until the 1st day of January, 1870. That act expressly declares, that the defendant's legal obligation to perform his contract, shall not be enforced by the process of the Court, until the 1st day of January, 1868, and after that time, only in the manner before stated. To that extent, the defendant is *relieved* from the performance of his legal obligation to the plaintiff, as the same existed, under the law, *at the time the contract was made,* by the act of 1866. The 4th section of that act, also declares, that any officer, or other person, (which includes the plaintiff) who shall violate the provision of the act, of 1866, shall be guilty of trespass, and liable to the defendant in damages, etc. Thus, it will be perceived, that by the act of 1866, the defendant is not only *relieved* from his legal obligation to the plaintiff, to perform his contract for a *definite* period of time, but that any officer, or other person, who shall enforce the performance of the defendant's legal obligation, within that time, to perform his

contract, as the same existed at the time the contract was made, shall be guilty of *trespass* and punished as a *trespasser*. The act not only relieves the defendant from his legal obligation to perform his contract with the plaintiff in the manner specified therein, but actually declares that the plaintiff shall be guilty of trespass if he shall enforce the performance of the defendant's legal obligation to perform his contract, imposed by the laws of the State, at the time the contract was made. The legal obligation of the contract is impaired by relieving the defendant from its performance as expressed in the act. The legal obligation of the contract is impaired, because the plaintiff cannot enforce the defendant's legal obligation to perform it, without being a *trespasser* and liable for damages under the act. Before the passage of the act of 1866, the defendant was under a *legal obligation* then resting upon him in its *full force*, to perform his contract. Is that legal obligation to perform his contract with the plaintiff as *binding* upon him *now* as it was before the passage of that act, or is that legal obligation *less* binding upon him *now* than it was *then?* The law of the State applicable to the contract as it existed at the time the contract was made, constituted, as we have shown, the exact measure of the defendant's legal obligation to perform it in accordance with its terms and stipulations. Is that legal obligation of the defendant to perform the contract the same *now* under the legislative enactment of the 13th December, 1866, as it was *at the time* the contract was made? Is the legal obligation of the defendant to perform his contract *now*, as *strong* and *binding* upon him as it was *when the contract was made?* If it is, then he obtains no relief from the performance of his legal obligation to the plaintiff under the contract, and the act of 1866, does him no good, confers no benefit upon him whatever, and the legal obligation of the contract is not impaired. If, however, the defendant's legal obligation to perform his contract is not *now* as *strong* and *binding* upon him as it was when the contract was made, what isit that makes that legal obligation to perform it *less strong* and *less binding* upon him? Most unquestionably it is the provisions of the act of 1866,

which declares that the defendant's legal obligation to perform that contract, as the same existed at the time the contract was made, shall not be enforced by the levy and sale of his property under any execution founded on any judgment rendered upon that contract, until the first of January, 1868, then only one-third thereof, and the remaining two-thirds on the first January, 1869, and first of January, 1870, respectively. The act *postpones* the ultimate performance of the defendant's legal obligation of his contract until the first of January, 1870. The act of 1866 prescribes *conditions* for the performance of the defendant's legal obligation *prejudicial* to the rights of the plaintiff, which did not exist under the laws of the State creating and defining that legal obligation, *at the time the contract was made.* Will any honest, fair-minded man undertake to say, when we take into consideration the defendant's legal obligation to perform his contract, as that legal obligation existed under *the law at the time the contract was made,* and his legal obligation to perform it *now* according to the provisions of the act of 1866, that his legal obligation to perform that contract has not been *postponed, altered, weakened* and *impaired* by that act? One fact is quite apparent at least, that the defendant's *legal* obligation to perform his contract under the provisions of the act of 1866, is *not* the same as it was under *the law* applicable to the contract at *the time it was made,* and *the* question is, whether that act *impairs* that *legal* obligation.

But the argument for the defendant is, that the act of 1866 only affects the *remedy*, and that the remedy is no part of the contract, therefore it is not within the constitutional prohibition. The reply is, that the constitution does not prohibit the Legislature from passing laws impairing *contracts.* The constitution declares that "no State shall pass *any law* impairing the *obligation* of contracts." Whether the defendant's legal obligation to perform his contract with the plaintiff has been impaired by the Legislature, under the name or form of a *remedy* or any *other name*, makes no difference; the question still remains to be answered, does the act of 1866 *impair the legal obligation of the defendant's contract with the plaintiff?*

That the Legislature may pass remedial statutes is readily conceded, provided always that such remedial statutes do not *impair the legal obligation of contracts.* A statute of limitation does not affect or impair the *legal obligation* of the contract, it merely prescribes the time within which that legal obligation shall be enforced, the obligation itself remains *intact.* Acts of the Legislature abolishing imprisonment for debt, as well as acts exempting certain property from sale under execution, have been held not to be within the constitutional prohibition, for the reason that such acts *merely modified the remedy,* but did not touch or interfere with the *legal obligation* to perform the contract, that legal obligation to perform the contract still remaining in full force and binding upon the parties, as the same existed at the time the contract was made. This class of cases does not necessarily limit, postpone, restrict or impair the binding force of the legal obligation to perform the contract, as the same existed at the time it was made, but simply declares *the manner* in which that legal obligation shall be enforced—the legal obligation to perform the contract according to its terms and stipulations, remaining *untouched.* A remedial statute, however, is as much *a law* as any other statute, and is as much within the constitutional prohibition as any other statute, where it *impairs the legal obligation of contracts.*

Under ordinary circumstances and in prosperous times, this would be considered a plain proposition, but we are told by high authority that "God hath made men upright, but they have sought out many inventions." It was doubtless the object of the framers of the constitution to protect the legal obligation of contracts from the *subtle inventions of remedial law makers,* as well as all others. It has been contended that it is competent for the Legislature, under the constitution, to regulate the remedy to enforce the legal obligation of contracts, provided *some remedy* is left, but that it would be *unconstitutional* to deprive a party of *all remedy* to enforce the legal obligation of his contract. If it would be a violation of the constitution to deprive a party of *all remedy* to enforce the legal obligation of his contract, what clause

Aycock, *et al.*, *vs.* Martin, *et al.*

of the constitution would such legislation violate? If it would be a violation of that clause of the constitution which declares that "no State shall pass any law *impairing* the obligation of contracts," why is it not equally as unconstitutional to enact a law which postpones, alters, imposes conditions, or dispenses with the performance of that legal obligation for a definite period of time, as it would be to defeat the performance of that legal obligation by withdrawing *all remedy* for its enforcement? It is a question of *degree* only, the one *destroys* the legal obligation to perform the contract by preventing its enforcement, the other only *impairs* it. According to the interpretation given to this clause of the Federal constitution by the Supreme Court of the United States, we do not entertain a doubt that the act of 1866 would be held by that Court to be within the constitutional prohibition, and in our judgment, the decisions of that tribunal upon questions arising under the constitution of the United States, are binding authority upon the Courts of this State. Sturges vs. Crowninshield, 4th Wheaton's Rep., 191; Green vs. Biddle, 8th Wheaton's Rep., 1; Bronson vs. Kinsey, 1st Howard's Rep., 311; McCracken vs. Hayward, 2d Howard's Rep., 608.

But this act of 1866 expressly operates upon the legal obligation of contracts made *before its passage*, and to that extent is *retroactive*, and is expressly prohibited by the constitution of the State of Georgia. Neither by the constitution of the United States or by the old constitution of this State, are *retrospective* laws or *retroactive* laws prohibited. This was considered an evil which the people of Georgia in adopting their new constitution, intended to remedy and *prohibit*. If the framers of the new constitution did not intend to prohibit the Legislature from passing *retroactive* laws operating upon the legal obligation of *past* contracts which might *injuriously* affect any right of the citizen, it is extremely difficult for this Court to say what they did intend. To maintain the integrity of the fundamental law of the State, is one of the highest and most sacred duty of every Court. Unless this shall be done faithfully and independently, there

is no security for the protection of either persons or property. In Vanhorn's Lessee vs. Donanee, (2d Dallas' Rep., 304,) the Supreme Court of the United States, soon after the organization of the Federal Government under the constitution, announced the true legal rule upon this subject : "The constitution is stable and permanent, not to be worked upon by the temper of the times, nor to rise and fall with the tide of events; notwithstanding the competition of opposing interests and the violence of contending parties, it remains firm and immovable, as a mountain amidst the strife of storms, or a rock in the ocean amidst the raging waves. It is a clear position, that if a legislative act oppugns a constitutional principle, the former must give way and be rejected on the score of repugnance. It is a position equally clear and sound, that in such cases it will be the duty of the Courts to adhere to the constitution, and to declare the act *null and void.* The constitution is the basis of legislative authority ; it lies at the foundation of all law, and is a rule and commission by which both legislators and judges are to proceed. The constitution fixes *limits* to the exercise of legislative authority, and prescribes the orbit in which it must move. Whatever may be the case in other countries, yet in this there can be no doubt that every act of the legislature repugnant to the constitution, is *absolutely void.*" It has been justly remarked by an eminent civilian, that "To attack the constitution of the State and to violate its laws, is a *capital crime* against society ; and if those guilty of it are invested with authority, they add to this crime a *perfidious abuse of the power* with which they are intrusted." Vattel, 9, section 30.

The conclusion of the majority of the Court in this case, therefore, is, both upon principle and authority, that the binding force and coercive power of the law applicable to the contract as the same existed *at the time it was made,* constitutes *the obligation* of the contract. The defendant was legally bound by that *existing law*, to perform it in accordance with its terms and requirements, and the plaintiff had the *legal right* under that *existing law*, to enforce the performance of that *legal obligation.*   Any subsequent act of the

Legislature, therefore, *remedial* or otherwise, which alters or changes the then existing law which created and defined *that legal obligation* to such an extent as to make its legal force and power *less binding* upon the defendant to perform it, *postponing* or *obstructing* its enforcement, or imposing *conditions* for its performance, not prescribed by *the law* which created and defined that legal obligation *at the time* the contract was made, necessarily *impairs it*, and is prohibited by the constitution.

But it is said the act of 1866 affects only the remedy, and therefore is not within the constitutional prohibition.    The pertinent inquiry is, how does the proposed *remedy* affect the *legal obligation* of the contract *at the time it was made?*    Does it *impair* it or not?  This is *the* vital question in the case to be answered.    The act of 1866, it will be perceived, creates a *new* and *different* obligation for the performance of the contract, from that imposed on the defendant by the *existing law* at the time the contract was made.    The legal obligation to perform the contract which existed under the old law at the time the contract was made, is *postponed* until the first of January, 1868, *absolutely*, and conditionally until the first of January, 1870.    The binding force of the legal obligation to perform the contract, and the coercive power of the law to compel its performance, which existed at the time the contract was made, is *less strong* and *less binding* upon the defendant *now*, under the provisions of the act of 1866, than it was *then*, as will readily be perceived by reference to the act.    The act of 1866 prescribes *conditions* for the performance of the legal obligation of the contract, which were *not* prescribed by the old law applicable to the contract at the time it was made, to the *injury* of the plaintiff's rights arising under and secured by that old law creating and defining *that legal obligation.*    The act of 1866 *prohibits* the plaintiff from exercising his *legal right* to enforce the performance of the defendant's legal obligation to perform his contract as the same existed under the *old law* creating and defining that legal obligation at the time the contract was made, under the penalty of being a *trespasser.*  The act of 1866 does all these

things, which, in the judgment of a majority of this Court, the constitution of the United States and the constitution of State of Georgia expressly prohibit from being done, either under the name or form of a *remedial law*, or any other law of like character, producing the same practical effect.    The judgment of the majority of this Court therefore is, after the most careful examination of this question, that the act of 13th December, 1866, *impairs* the obligation of the contract between the parties in this case, as the same existed under *the law* prescribed by the supreme power in this State, *at the time the contract was made*, which being expressly prohibited by the constitution, the said act is therefore *null and void*.

Let the judgment of the Court below be affirmed.

HARRIS, J. concurring.

WALKER, J. dissenting.

HARRIS, J.

The three cases stated at the head by the reporter, whilst they vary in their facts, by the Judges below, to-wit, Judges Milner, William M. Reese and John T. Clarke, were made to depend upon the question, whether the acts of the Legislature of Georgia, of March and December, 1866, commonly called *stay-laws*, were violative or not of the 10th section of the 1st article of the constitution of the United States, which prohibits a State from passing any law impairing the obligation of contracts.

The act of the 12th March, 1866, *prohibits* the levy or sale of the property of defendants *founded on judgments or decrees of any Court heretofore rendered on any contract or liability made or incurred prior to June*, 1865, provided defendants shall pay during each year one-fourth of the execution, so that the whole debt be paid by the 1st January, 1870.   It further provides that plaintiff may levy, upon first making oath that defendants have absconded or removed, or are removing their property ; but upon a counter affidavit of defendant denying these grounds, he may stay the execution, by giving bond and security to pay the same as provided, by

installments, or where unable to give security, that he may file his affidavit of inability.   It also enacts that *any officer* or other person, who *levies otherwise than directed,* shall be guilty of a trespass, and liable in damages for *not less* than the amount of the execution.

The act of December, 1866, also *prohibits* levy or sale by execution founded on contracts made prior to June, 1865, *except* by annual installments, unless the defendants are absconding or removing property *fraudulently* to avoid payment of just debts ; nothing, however, in said act to be construed so as to prohibit defendants from removing from one county to another produce or property *for the purpose of sale,* nor a person removing from one county to another from carrying their property with them, when the same is not done to evade their just debts.   This act also makes officers and others liable to actions of trespass, who do not comply with its terms, and prohibits securities as well as plaintiffs from causing execution to be levied, *except on conditions.*

The two first cases stated at the head of the report are executions founded on judgments rendered previous to June, 1865 ; the last mentioned case is an action of trespass against a sheriff for levying contrary to this last act.

Before entering upon the examination of the words and meaning of the clause of the constitution of the United States to which these acts of the Legislature were held obnoxious by the Courts below, it cannot but throw a broad and clear light upon our pathway, to *ascertain what were the mischiefs* which led the patriot statesmen of the revolution to insert, when framing the constitution of 1789, this most important prohibition therein, and what ends were sought to be attained thereby.

In Sturges vs. Crowinshield, 4 Wheaton's Rep'ts, decided in 1819, Chief Justice Marshall said, that chief among those mischiefs were the State laws in existence from 1783 to 1789, " *directing the judgments of the Courts to be carried into execution by installments ;*" these laws produced the loudest clamor and were most immediately felt.   But much more

than the prohibition of tender laws and installment laws, was intended by the convention.

To restore public credit completely, it was necessary not only to prohibit particular evils like those mentioned and *particular* means, (for they well knew that the same mischiefs might be effected by other means,) *but to prohibit the use of any means whatever by which the same mischiefs might be produced.*"

Hence, to prevent the recurrence of *installment* laws, tender laws, etc., the convention determined to establish a great enduring principle which should pervade all the States of the Union, and control, to a certain extent, their general powers of legislation.     That great principle was *the inviolability of contracts*. The convention did not design by this clause to enumerate particular subjects to which it should apply.     To what purpose enumerate the particular modes of violation which should be forbidden, *when it was intended to forbid all?* I repeat that the principle which the convention meant to establish was the *inviolability of contracts, and this principle was to be protected, in whatever form it might be assailed.* Hence, the expressive and comprehensive prohibition of the constitution : " No State shall pass *any* law *impairing* the obligation of contracts."

In Ogden vs. Saunders, in 12 Wheaton's Reports, decided in 1827, Chief Justice Marshall, in other words, presents the same ideas :

" The power of changing the relative situation of debtor and creditor, of interfering with contracts, a power which comes home to every man, touches the interests of all, and controls the conduct of every individual in those things which he supposes to be proper for his own exclusive management, *had been used to such excess by the State Legislatures* as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man.     The mischief had become so great, so alarming, *as not only to impair commercial intercourse and threaten the existence of credit, but to sap the morals of the people and destroy the sanctity of private faith.* The object of the convention, therefore, was by this

article *to impose restraints on State legislation as respected contracts, and to prohibit the use of any means by which their inviolability might be assailed."*

And here I might stop, as I have shown that a chief evil or mischief which led to the adoption of the prohibition of the constitution, was the laws of the States *directing judgments to be paid by installments,* and as the acts of 1866, for the payment of executions by annual installments, are identical in character, they are necessarily within the prohibition of the constitution; *but as stay-laws, in some form or other, are likely to be again attempted, with an expectation of their being sustained by a corrupt Judiciary, regardless of their oaths to support the constitutions of the United States and of the State of Georgia,* a fuller examination of the several clauses of them bearing on the questions which the record suggests, cannot be without utility in demonstrating the wholesome (however unwelcome) truth which the people should learn at the earliest moment, *that all stay-laws, however cunningly and evasively framed, operating* RETROSPECTIVELY *upon judgments and contracts, so as to delay and hinder their collection, or designed to impede the Courts in the performance of their healthful and accustomed functions under the constitutions, are fraudulent and dishonest violations of those constitutions, which their legislators as well as their judges are solemnly sworn to obey.*

Having acquainted ourselves with the mischiefs which preceded and caused this prohibition on State legislation, let us examine in the light of the adjudications of the Supreme Court of the United States, and of distinguished commentaries on constitutional law, the meaning of the words *impairing the obligation of contracts.*

From Chief Justice Marshall let us collect the definitions which have given form and force to our conclusions, and on which our reasoning essentially depends. A contract is defined by him with sufficient accuracy for our purpose, to be " an agreement to do or not to do a particular thing." He then defines the obligation of the contract thus: " *The law binds* the promisor to perform his undertaking, *and this* is

of course *its obligation.*" Sturges vs. Crowninshield, 4 Wheaton's Reports.

It should be constantly borne in mind that the language of the constitution is, impairing the *obligation* of the contract, not impairing *the contract;* for if the latter only had been intended, the language would have corresponded with the intention. It is therefore evident that, in the minds of the framers of the constitution, impairing the contract and impairing the *obligation* of the contract were not the same thing, but were distinct.

*The law binding* the promisor to performance *being the obligation* of the contract, we are carried a step further to enquire *what law ?*

Is it the law existing when the contract was made, or is it the law existing when the contract is broken? Is it universal law or the law of nature, or is it the municipal law of the country where the parties contract ?

That universal law may enter into and form the obligation of a contract to some extent, will, I take it, depend very much upon the conditions in which the parties are placed when the contract is made, and will act or not according to those conditions. But into this question, which I deem rather speculative than practical, and one incapable of accurate ascertainment, I shall neither enter nor discuss it. We are concerned with a question not remote but *proximate* and pressing for solution.

It admits of no dispute that, of all subjects which can engage the attention of legislators, no one opens so wide a field for the exercise of their wisdom as that of contracts. With an uncontested power to declare *in advance* what contracts shall be legal and what shall not be legal, what forms they shall assume,—in general to regulate how they shall be made, evidenced, and when broken enforced by the powers of society, the duty of government, as it has deprived individuals of all personal power of coercion, is the protection of contracts by compelling their performance.

, As this power over contracts has been exerted for centuries by civilized nations before the adoption of the constitution,

what is there to render it at all *probable* that the convention looked beyond or to anything else as constituting the obligation of contracts, than the municipal law, written or unwritten, which existed when the contract was made?

It cannot be disputed that long previous to the making of the constitution, *the common-law of force in the then thirteen States* whose representatives framed the constitution, had declared what contracts were legal and what illegal, and had provided modes of procedure to be pursued in the Courts, and remedies for the enforcement of judgments against those who had broken their contracts.

If this is correct, what else *rationally* could the framers of the constitution have meant but *the* MUNICIPAL LAW EXISTING *contemporaneously with the contract* as constituting the *obligation* of the contract, the binding force on the promisor, to coerce performance?

The obligation then is not the *contract,* is not *in* the contract, nor does it constitute *any one of its terms,* nor is it equivalent to all the terms united. The municipal law, or the *lex scripta et lex non scripta,* according to the definition of Chief Justice Marshall, constitutes the *obligation* of the contract. *The binding law and the* OBLIGATION *are convertible terms.*

When the contract is made, the existing, binding law, whatever it may be, being the *obligation* on promisor to perform his undertaking, *eo instanti* attaches, adheres to the contract, and ever must, until it is lawfully discharged. It accompanies the contract throughout its existence, and thus the contract and obligation become *inseparable.* The *terms* of the contract are made alone by the parties to the agreement.

The obligation is the *creature* of law,—is *the law existing when the contract is made, binding to the performance of the promise, and is furnished solely by society.*

*This existing law then, constituting the obligation of the contract, is what the convention meant to prohibit being impaired;* or in other words, *the constitution was designed to prohibit a State from passing any law which would take away* [by

repeal] *or alter that existing, binding law, so as, in any degree whatever, to diminish its force.*

If this opinion of what constitutes the obligation of a contract be correct, (and it must be so logically, if the definitions of Chief Justice Marshall are accurate,) then it follows that the *attempted* distinction between the obligation of the contract and the remedy for its enforcement, is *unsound*, that so far from being separate and distinct they are identical ; and it further follows, that the proposition of the power of State legislatures to withdraw or alter remedies existing at the time of the making of a contract, cannot be for a moment maintained in argument, as such power would be a power to impair the obligation of contracts. To admit such legislative power would be to sanction a repeal of the constitution.

After enumerating many of the mischiefs which had previously existed, and which the convention intended to cut up by the roots, so that they could not in the future recur, with a force and fullness which made the prohibition of the constitution efficacious in all time to come for the protection of all legal contracts against any and every mode of assault or evasion by State legislatures, this illustrious Judge, captivated by a distinction thrown out by a very eminent lawyer, (Mr. Hunter, of New York,) in the course of his argument in the case Sturges vs. Crowninshield, adopted it, and in the course of the opinion delivered, presented it along with the train of argument used in deciding the case made by the record.    That case required no such distinction to be made, nor any such assertion of legislative power over remedies, as was made. *The case called for no expression of judicial opinion on either point.* They were *obiter dicta.* They have been productive of infinite controversy. They have perplexed the legal mind of the country ever since. They have been the parents of a prolific brood of insidious and evasive efforts made by State legislatures, under the promptings of unprincipled demagogues, who have the people ever on their tongues but never in their hearts, to destroy the machinery of government itself, by causing collisions among departments where there should be harmony, provoking, moreover,

collisions and arousing jealousies between the States and General Government, in the exercise of the powers granted by the people.

If the distinction was sound, and the power of the legislature over remedies as large as is inferred from the loose and inaccurate language employed, without any apparent effort to fix its boundary, it seems to me that the inevitable consequences would be to emasculate the prohibition of the constitution of all its energy and sanitive efficacy.

Such power as has been asserted at the bar, since the case of Sturges vs. Crowninshield, relying on the distinction said to exist, is so entirely antagonistic to the history as furnished by Chief Justice Marshall himself, of the causes which induced the prohibition of the constitution, and its extent, that it is necessary to ascertain how far the legal mind of the country, and especially how far the decisions of the Supreme Court of the United States, have recognized that distinction or the existence of that power.

If I had not been sustained by very great names, as well as by the opinions of eminent Justices of the Supreme Court of the United States, and its uniform decisions since the case of Sturges vs. Crowninshield, (as I will presently exhibit,) I would have ventured to express with hesitancy my own convictions, derived as they are from a close study of all of them, but more especially from the opinions of Chief Justice Marshall.

Accepting as I have from the Chief Justice his definition of the obligation of a contract, I may be permitted to say that that definition, to my mind, utterly excludes the existence of a distinction between obligation and remedy.

The law *is the binding obligation*, the *law* is also the remedy. There is such an identity between them, that I am constrained to confess that I am wholly unable to comprehend their separate existence. Logically, so long as the definition that *the law binding* to the performance of the contract *is its obligation*, is adhered to, there can be no such distinction.

If the obligation was in the contract itself, resided in and

constituted a part of it, such a distinction might be attempted with more success.

Clear as we had deemed his definition of the *obligation* of a contract, shortly after making it I find this illustration used by him : " In the case at bar, the defendant has given his promissory note to pay the plaintiff a sum of money on or before a certain day. The contract binds him to pay that sum on that day, and this *is its obligation.*" "Any law which releases a part of *this obligation,* must, in a literal sense of the word, impair it."

This seems to me to obscure our investigation. We have been in search of the residence of the obligation of the contract ; at one moment the Chief Justice places it in and makes it the binding law—in the next, it appears to be *in the contract.*

Hercules accomplished many wonderful labors at the bidding of a task-master, which we recall to memory with wonder, but that task-master never imposed so cruel a task as that of reconciling things that are irreconcilable. Whoever shall succeed hereafter in making the obligation of the contract to be in the binding law, and at the same time in the contract itself, will have accomplished a labor far more astonishing than all which have immortalized the son of Jupiter.

I remark, however, in passing, that it is not at all essential to the determination of the cases in the record, to settle the question whether the obligation of the contract is in the binding law, or in the contract itself. If in either, the stay-laws are violative of it.

But if nothing was meant by the expression "*the obligation*" of the contract, as distinctive from the contract, it cannot but excite the enquiry why the framers of the constitution did not use the simple language " No State shall pass *any law impairing contracts ?*" All contracts allowed by existing laws at the time they are made, *are by all nations held as sacred and beyond the power of legislation to change their stipulations.* If no more than a prohibition to impair *them* was meant, the prohibition might be esteemed by very many as superfluous. More must have been meant, and we

are brought back again to enquire what was meant by the phrase impairing the obligation of contracts?

Could it be anything other than a prohibition on a State from passing any law which interfered materially with the existing *binding laws—they constituting the obligation* of the contract?

The contract and its terms, being made entirely by the agreement of the parties, exists of itself everywhere, incapable of alteration by legislation, protected by the principles and provisions when made of existing laws.

In Ogden vs. Saunders, 12 Wheaton's Reports, Justice Washington, who sat by the side of Chief Justice Marshall when Sturges vs. Crowninshield was decided, said that he then and now concurred in the definition given of the *obligation* of the contract, by the Chief Justice, and that whilst admitting the universal law of civilized nations, which declares that all men shall perform that to which they have agreed, to enter into the contract and constitute its obligation, the municipal law, when it comes in collision with the other, is paramount, that whilst universal law is satisfied with nothing short of performance, municipal law may affect and control the validity, construction, evidence, remedy, performance and discharge of the contract.

It is then the municipal law of the State which is emphatically the law of the contract *made within the State,* and must govern it throughout, wherever its performance is sought to be enforced.   It forms a part of the contract and travels with it wherever the parties to it may be found.   It is so regarded by all the civilized nations of the world, and enforced everywhere, whether it affect the validity, construction or discharge of that contract.

Mr. Justice Thompson said : " Parties must be understood as making their contracts with reference to existing laws, and impliedly assenting that such contracts are to be construed, governed and controlled by such laws."

Mr. Justice Trimble said, (12 Wheaton, p. 327,) : " The great principle intended to be established by the constitution was the inviolability of the *obligation* of contracts as the ob-

ligation existed and was recognized by the laws in force at the time the contracts were made.    It furnished the legislature of the States a simple and obvious rule of justice, which *however* and *heretofore violated, should by no means be thereafter violated;* and whilst it leaves them *at full liberty to legislate upon the subject of all future contracts,* and assign to them either no obligation or such qualified obligation as in their opinion may consist with sound policy and the good of the people, *it prohibits them from retrospecting upon existing obligations upon any pretence whatever;* whether the law professes to apply to the contract itself, to fix a rule of evidence, a rule of interpretation, or to regulate the remedy, it is equally within the true meaning of the constitution *if it in effect* impairs the obligation of existing contracts."

Justice Trimble adds : " The obligation of a contract consists in *the power and efficacy of the law which applies to* and enforces the performance of the contract, or the payment of the equivalent for non-performance.    The obligation *does not inhere* and *subsist in the contract itself proprio vigore, but in the law applicable to the contract."*

The distinction between obligation of the contract and the remedy for its enforcement taken by Chief Justice Marshall, has not been approved by some of the most eminent jurists which this country has produced.

Chancellor Kent, in 1st vol. Com., 456, characterizes the language of Chief Justice Marshall in Sturges vs. Crowninshield, " as latitudinary and hazardous," and that it seemed to him *"whatever lessens or takes away from the extent and efficiency of the remedy to enforce the contract legally existing when the contract was made, impairs its value and obligation."*

In Mather vs. Bush, 16 John. R., p. 252, Ambrose Spencer, Chief Justice, commenting on Sturges vs. Crowninshield, said, " the opinion distinguishes between a case impairing the obligation of a contract and operating directly upon it, and a law affecting or modifying the remedy upon the contract ; the latter is admitted to be under the control of the legislative power of a State, *and although we may not feel the full force of the distinction,* it does not become us to analyze the

opinion or to reason upon it further than to observe that the remedy is essential in many cases to the contract, and *to modify it so as to frustrate the contract or render it less valuable, would have the indirect effect to impair its obligation.*"

Nor am I able to reconcile the following from Chief Justice Marshal, with his assertion of legislative power over the remedy, unless it be regarded as a qualification of a principle stated too broadly by him at another time :

" The release of a man's effects and property from the payment of what he stipulated, would be a violation of the *obligation* of the contract ; the *law subjects* the property at all times to pay the debt, and the withdrawal of it from that purpose, is a clear violation of the obligation of the contract.

" The property constitutes the means, the sole means, of satisfying his debts ; take that away and a mere naked promise is left the creditor, and the obligation is gone."

From these extracts it is evident that were the legislature to exempt the property of a debtor from sale to satisfy contracts made on the faith of the liability of that property, by a retrospective act, such act would be unconstitutional ; so also of an act exempting any portion of a debtor's property, which prevents a judgment-creditor from realizing thereby his demand ;—in other words they assert that the legislature cannot by any *retrospective* legislation affect the acquired rights of creditors to the application of the whole of a debtor's property to the payment of his debt.

From what does this lien on debtors' property spring, but the *sanction* of municipal law ?    The *remedy* provided by it is that sanction, *compulsory* on him who has broken his contract.

The withdrawal entirely of remedy so provided, or of a material part whereby the creditor is deprived of *entire* payment, is violative of the obligation of the contract according to the Chief Justice.    Do not these paragraphs virtually admit the obligation of the contract to be in *existing laws ;* and further, that the legislature cannot so legislate as to deprive a creditor of the benefits afforded him by the provis-

ions of those existing laws, in the compulsion of his debtor to comply with his engagement?

Mr. Justice Story, in 3d vol. of Commentaries, p. 250, thus condenses, up to the time of their publication, in 1833, principles which had been established by judicial decision:

" It is perfectly clear that any law which enlarges, abridges, or in any manner changes the intention of the parties resulting from the stipulations in the contract, necessarily impairs it. The manner or degree in which the change is effected, can in no respect influence the conclusion; for, whether the law affect the validity, the construction, the duration, the discharge or the evidence of the contract, it impairs its obligation, though it may not do so to the same extent in all supposed cases." Golden vs. Prince, 3 Wash. C. C. R., 309.

"Any *deviation from its terms by postponing* or accelerating *the period of performance which it prescribes, imposing conditions not expressed in the contract,* however minute or apparently immaterial in their effect upon it, will impair its obligation." Green vs. Biddle, 8 Wheaton, 84.

The following extract from the opinion of Chief Justice Taney, in the case of Bronson vs. Kinzie, concurred in by the whole Court, with the exception of Justice McLean, may be regarded as furnishing the fixed rule of the Supreme Court of the United States. This was decided in 1843. In 1844, in the case of McCracken vs. Hayward, it was reviewed and confirmed, Justice Baldwin delivering the opinion of the Court. See 2 Howard Rep., 611. It is believed that every case since, before the Court, involving an interpretation of the clause of the constitution which we have been considering, has conformed to the opinion of Chief Justice Taney.

To these decisions of that Court in the construction of the constitution, this Court is *by oath bound to conform its judgments.* I venture to say that if an *honest application* of the principles enunciated in these cases is made to the stay-laws of 1866, or indeed to *any stay-laws which a legislature may enact, operating upon existing contracts so as to delay or hinder the creditor in the collection of his debt, they cannot but be pronounced unconstitutional.*

Chief· Justice Taney says : " Whatever belongs merely to the remedy, may be altered according to the ·will of the State, *provided* the alteration does not impair the obligation of the contract.  *But if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself.  In either case it is prohibited by the constitution.*"

Can language be clearer ?   Does he not emphatically say that no retrospective legislation by altering existing remedies can be permitted to affect the value of the contract, its terms or its obligation ?

Again—" It is difficult, perhaps, to draw a line that would be applicable in all cases, between legitimate alterations of the remedy and *provisions which, in the form of remedy, impair the right.*   But it is manifest that the obligation of the contract and the rights of the party under it, may, in effect, be destroyed by denying a remedy altogether, or *may be seriously impaired by burdening the proceedings with new conditions and restrictions,* so as to make the remedy hardly worth pursuing.*"

"And no one, we presume, would say there is any substantial difference between a retrospective law declaring a particular contract or *class of contracts* to be abrogated and void, and one which took away all remedy to enforce them, or encumbered it with conditions that rendered it useless or impracticable to pursue it."

In McCracken· vs. Hayward, 2 Howard, 612, decided in 1844, Justice Baldwin said :

" The obligation of a contract consists in its binding force on the party who makes it.  *This depends on the laws in existence when it is made ;* these are necessarily referred to in all contracts, and forming a part of them, as the measure of the obligation to perform them by the one party and the right acquired by the other.  There can be no other standard by which to ascertain the extent of either, than that which the terms of the contract indicate according to their settled legal meaning ; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted

for, *and gives the other a right to enforce the performance by the remedies then in force.* If any subsequent law affect to diminish the duty or impair the right, it necessarily bears on the obligation of the contract in favor of one party to the injury of the other, hence any law which, in its operation, amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the constitution."

The obligations of the contracts between the parties in these cases, was to perform the promises and undertakings contained in the notes on which the judgments were founded, to pay the full amount of the notes at the day stipulated ; the rights of the plaintiffs were suits for damages for failure of defendants to comply, and to judgments therefor, and to have executions issued thereon after four days allowed for appeal, or after forty days if the executions were stayed legally by existing law, to have the services of the sworn officer of the Court to levy and raise by continued monthly sales, without molestation or interference from any quarter, the whole amount of their debts, until the executions were satisfied under existing laws.

" These laws giving these rights," in language of Justice Baldwin, " were as perfectly binding on the defendants, and as much a part of the contract, as if they had been set forth in their stipulations in the very words relating to judgments and executions."

" Any subsequent law which denies, obstructs or impairs these rights by superadding conditions," as payments by installments annually,—one-fourth each year,—and punishing the sheriff and all other persons as trespassers for levying otherwise, " is a denial of right."

" The same power in a State legislature may be carried to any extent if it exist at all ; it may prohibit a sale unless for the whole value, or nine-tenths, or three-fourths ; *if it can be exercised at all*, it must be a matter of uncontrolled discretion in passing laws relating to the remedy, which are regardless of the effect on the rights of plaintiffs."

" The case of Bronson vs. Kinzie was decided on the

Aycock, *et al.*, *vs.* Martin, *et al.*

broad and general principle *that State laws, which professedly provided a remedy for enforcing the contract* of mortgage, *effectually impaired the rights incident to and attached to it by the laws in force at its date, and were void."*

" No agreement or contract can create a more binding obligation than those fastened by the laws—which the law creates and attaches to contracts."

Now, in none of the opinions of the Justices of the Supreme Court of the United States, all of which admit the general power of State legislatures over remedies by prospective and retrospective laws without any restriction whatever, except that they may not pass any law impairing the obligation of contracts, is there anything to authorize the position assumed in argument—that the legislature might repeal *existing remedies given to enforce existing contracts,* so that by the repealing law a *scintilla of remedy was* left, and that such legislation was not violative of the constitution as to existing contracts. Chief Justice Marshall, in Ogden vs. Saunders, was constrained, whilst asserting general legislative power over remedies, to condemn *retrospective* legislation. "There is an essential difference in principle between laws which act on *past* and those which act on *future* contract; *those of the first description can seldom be justified."*

So far from the position of counsel deriving any support from them, those opinions clearly assert that any *retrospective* legislation on existing remedies at the time the contract was made, so as to affect or impair the obligation of existing contracts, or clog or burden the remedies furnished for the enforcement of *existing* contracts with new proceedings and conditions, would be violative of the constitution.

For any Court to tolerate a withdrawal of existing remedies, except a mere *scintilla* and that inefficacious, and to pronounce that *thereby* the constitution was not violated, would be to sanction a gross fraud on that instrument, and, by thus countenancing, either through weakness or corruption, such a violation of its letter and spirit, would reproduce the identical mischiefs which caused the framers of the constitution to insert this prohibition on State legislation.

Since writing the foregoing portion of my opinion, my attention has been called to a very recent case decided by the Supreme Court of the United States, reported in 4 Wallace Reports, 535. The opinion of the whole Court was pronounced by Justice Swayne. This case brings the decisions of the Supreme Court down to 1867. I have not these Reports in my library, but from the extract I have seen from this case, after commenting upon the various cases which had been before that tribunal, it re-affirms with great clearness the principles asserted in Bronson vs. Kinzie, and McCracken vs. Hayward.

A recent commentator (Sedgwick) on constitutional law, after citing and reviewing all the cases in the Supreme Court of the United States wherein this prohibition of the constitution is drawn in question, concludes with a naive confession in which hundreds of others can heartily unite—that he was free to confess his entire inability to distinguish between the obligation of the contract and the remedy. Obligation, I suppose, means *binding force*, the force or constraint which binds the party to perform his agreement. What then is, in legal acceptation, the binding force of the contract? It is not certainly the mere naked promise; it is not the moral duty? It is not the honor or fashion that binds the contracting party to keep his engagement? *What is it then but the remedy*—the coercive remedy which the law gives against the person or property of the defaulting party? It seems to me that, looking at a contract legally and practically as an instrument by which the rights of property are created and on which they repose, *obligation and remedy are strictly convertible terms*. Take away the whole remedy and it is admitted that the contract is gone. How then, if a material part of the remedy be taken away, can it be said the obligation is not impaired? A confusion would seem to have arisen from not taking into consideration the full sense of the term impaired. It is said the remedy forms no part of the contract, and that the creditor makes his bargain knowing that he is at the mercy of future legislation, but as I understand it, all the cases distinguish between the operation of

State insolvent laws and State stop laws passed before the making of the contract, and *those made after*, proceed on the very ground that the *legislation in force at the time of the contract* enters *into* and *forms* a part of it.   It is said again that in all countries and at all times, the remedy has been under the control of the sovereign authority.    This is merely begging the question, or rather arguing from false analogies. The very question with us is, *whether under our system we have not declared a different rule.*   No one seeks to deny that the remedy should be, *to a certain extent*, under legislative control.    Tribunals may be changed, procedure altered ; these modifications do in no wise impair the remedy or prejudice the holder of the contract.    But it seems to me the only logical rule to hold is, that any legislation which *materially diminishes the remedy given by law to the creditor at the time his contract is made*, just so far *impairs* the obligation of the contract."

The adjudged cases, and especially all since Sturges vs. Crowninshield, and to those we must look as furnishing the rule for our decision, beyond a doubt sustain the views of Mr. Sedgwick.

It cannot but challenge notice that those who maintain the constitutionality of the stay-laws rely mainly on adjudications of the State Courts of Pennsylvania, Iowa, Massachusetts, New York, Arkansas and Michigan.    These adjudications are in no sense authorities.    They cannot control or influence, in any respect, the judgments we are called on to pronounce here.    What though all united in the assertion of the right of State legislatures by subsequent laws to affect existing contracts by withdrawing or modifying remedies, it would not avail an atom.    This Court is bound by oath to take the law from the Supreme Court of the United States in all questions where the constitution is drawn into controversy, and upon it hinged the determination in the State Courts.    It is the requirement of the Code.    It is demanded by the structure of our government and the fitness of things.    The obligation of the decision of that Court upon us is forcibly stated by Chancellor Kent in Hicks vs. Hotchkiss, 7 John.

Ch. R., 303. " The decisions of the Supreme Court of the United States upon questions arising upon the construction of the powers and authority of the constitution, must be *defini-tive* and *binding upon all the tribunals of the Union,* because the *constitution has made their judgments final.* The proposition that the State Courts are equally supreme, independent and absolute in the consideration and decision of such national questions, strikes me as untenable. It would lead to the subversion of all order and subordination. There must be a paramount power somewhere. The Supreme Court of the United States, on questions *within its cognizance,* is that power, and if the State Courts were to undertake to disobey or elude its decisions, the consequences would be discord and confusion, or a dissolution of the nation's compact."

We therefore put all the State adjudication cited, out of our path. They furnish no rule we can follow. They are condemned by an unbroken series of decisions of the Supreme Court of the United States, from Fletcher and Peck down to the present moment; nor can any dissentient opinion of any Justice of the Supreme Court furnish a rule for our guidance. It is the judgment of the majority which binds our consciences and furnishes the rule which we are sworn to obey.

Brought to the test of the principles which have been stated, how can the stay-laws of 1866 be held otherwise *than palpably unconstitutional?*

Dismissing all discussion about the distinction between obligation and remedy, dismissing any further discussion as to extent of legislative power over remedies, these stay-laws either *act on the contracts,* or on the remedies existing when they were made, providing for their enforcement when broken. If the judgments are contracts, (and if there be those who deny them that character, I can but regard them as mere quibblers,) then the terms of these contracts are materially (though indirectly) changed by the acts of 1866, and this change, whether direct or indirect, renders those acts unconstitutional. If these laws act on existing remedies

Aycock, *et al., vs.* Martin, *et al.*

materially so as to lessen their value, or impose new conditions upon them, they are unconstitutional.

The stipulations originally in two of the cases brought before the Court, were to pay specific sums of money at specific times.   The broken contracts were placed in judgment, the judgments obtained at once *liens* on defendants' property, executions issued, and they were delivered to the sheriff to raise the money due to plaintiffs, and by such executions he was commanded by the Judge to bring the same into Court, together with the execution.   The law furthermore gave plaintiffs in execution a right thereto, and authorized the transfer of such executions as effectually as the owner of a promissory note might transfer it by endorsement.

These remedies were vested in plaintiffs by laws existing when the contracts were made, and after executions have issued under the laws, the acts of 1866 were enacted, and through them it is sought to deprive plaintiffs of the rights they had actually acquired in remedies previously provided. In my opinion the plaintiffs had obtained vested rights in the judgments and executions in their favor, which no subsequent legislation could control, alter or affect. Are not these vested rights impaired by these acts, which forbid the officer from levying and raising by sale of property but one-fourth of the debts due them, and that only by annual installments?

The right of plaintiffs, the owners of these *fi. fas.*, to levy them, is utterly prohibited for four years, unless they will assent to the terms of these acts, and to receive their debts by installments.

These acts withdraw from the satisfaction of the *fi. fas.*, three-fourths of the debts due plaintiffs.  Plaintiffs are moreover debarred from levying, unless after making an oath which few can make, on any produce or property carried to market, or from one county to another for sale,—though all of that property is bound by judgment lien, and its proceeds when sold should be applied to the extinguishment of that lien.

Are not these in effect material alterations in the terms of the contract ?   Do they not impose restrictions and burdens

on the remedies which existed when the contracts were made, which render them of less value? Either the one or the other is alike violative of the constitution of the United States.

How far Judge Warner may concur with me in the views I have taken and embodied mainly in the foregoing pages, I cannot say; it is, however, enough to say that we both unite in affirming the judgments below, which decided that the stay-laws of 1866, were violative of that clause of the constitution of the United States, which prohibited a State from passing any law impairing the obligation of contracts.

*The acts of 1866 are violative of the State constitution.*

If the acts of 1866 were by possibility not obnoxious to the prohibition of the constitution of the United States just mentioned, I cannot see any escape for these sticklers for unlimited legislative power over remedies, from the inhibition of the State constitutions of 1861 and 1865, prohibiting the legislature from passing any retroactive laws affecting *injuriously the right of the citizen.*

That the plaintiffs have had a vested right in their judgments and executions, will strongly appear by a quotation I am about to make from a State Court which has as earnestly and with more ingenuity than any other known to me, sought to evade by construction the full force of the prohibition on State legislation touching contracts. Thus in Bigelow vs. Pritchard, 21 Pick. R., 174, decided in 1838, the Court said: "A creditor has no vested right in the mere remedy, *unless he may have exercised that right by commencement of legal process under it, before the law making an alteration concerning it shall have gone into operation.*"

The acts of 1866 were passed subsequent to the adoption of the State constitutions of 1861 and 1865, and were subsequent to the judgments and executions of the plaintiffs. They act on the judgments and executions of plaintiffs, and affect *injuriously* their rights, and are therefore violative of the State constitution.

*The stay-laws of 1866 are violative of the clauses of the State constitution distributing the powers of government.*

There is still another field of investigation in which I propose to examine how far these acts can comport with other clauses of the State constitution.    These clauses are the 1st section of the 2d article and the 1st section of the 4th article.

The 1st section of the 2d article is in these words : " The legislative, executive and judicial departments shall be *distinct,* and each department shall be confided to a separate body of magistracy.    No person or collection of persons, being of one department, *shall exercise any power properly attached to either of the others,* except in cases herein expressly provided."

The 1st section of 4th article is in these words : " The judicial powers of this State shall be vested in a Supreme Court for the correction of errors, a Superior, Inferior, Ordinary and Justice's Courts, and such other Courts as have been or may be established by law."

To me it is apparent that the stay-laws had their origin in the belief which some, who had not considered the questions profoundly, entertained of the power of State legislatures over remedies.    I have endeavored to show how effectually that power is restrained by the prohibition designed to protect contracts from their interference.

I have, from the State constitution in addition to the other, shown an emphatic prohibition of all retroactive laws, under whatever guise enacted, which can affect injuriously the right of any citizen ; and I am decidedly of the opinion that in the paragraphs just quoted from the State constitution duly enforced, will be found a still further marked limitation upon legislative power.

That the legislature must use, in giving full effect to the distribution of powers made by the State constitution, its peculiar faculty, by enacting general, impartial and prospective laws furnishing rules of procedure for Courts and its officers, and remedies for all wrongs, is not simply conceded, but insisted upon as a high constitutional duty which their oaths require them to perform—a duty not to be deferred— nor are these remedies to be withheld.

All legislative power is a trust—it is a power to do their

duty within the sphere marked out for them with discernment and good faith, to comply honestly with the obligations imposed by the constitutions on their understandings and consciences, and at all times to support them in their genuine spirit.

Enjoined by oath to support the constitution of the United States, containing a prohibition on them to pass any law impairing the obligation of contracts, the presumption is that they would avoid reproducing the mischiefs and repeating the enactments (installment laws in particular) which were condemned and prohibited by that constitution.    No *power* to abuse such delegated power was given or could be conferred, without conferring a power to destroy the government itself.    The argument, therefore, that a legislature has power to withhold or withdraw efficient remedies, leaving no substantial effective ones for the redress of wrongs, involves an absurdity, and if acted on, can produce nothing but anarchy.

But the question is not one of failure to provide remedies originally, as demanded by duty to the constitution, but the abuse of power by modifying those provided, by new laws, in such a manner as to impair their value, indirectly altering the terms of executions, annulling the liens of judgments by withdrawing produce and property from their reach, and in effect moulding the judgments of the Courts and interpolating new conditions without the assent of those whose property they are.

I have, in the course of this opinion, stated the three several constitutional barriers which the people, in prescribing fundamental laws, erected to protect their rights against their own violence, and as thorough checks at all times upon the conduct of their agents.    Each, it was supposed, would prove a *cordon sanitaire*, and stay the spread of those fitful paroxysms of popular phrenzy, which war and other calamities in the history of nations so often generate.    Such, however, have been the fearful teachings of men who have not thoroughly studied the peculiar structures of our State and general governments, nor duly estimated their characteristic feature, the distribution of all the powers of government to

Aycock, *et al., vs.* Martin, *et al.*

separate bodies of magistracy, that an idea, anti-American in every respect, has seized upon the public mind which, if not arrested and corrected, cannot but work a revolution in our forms of government more, *far more* to be dreaded than the desolation of war itself.

I mean the idea of the almost unlimited power of legislatures. This has been derived from the pages of Blackstone, of Story and of Kent, and from many expressions which have fallen from eminent Judges of the Supreme Court of the United States. The idea of a supreme power in any department of government is *British* in theory if not in practice, but is utterly antagonistic to our institutions, which recognize no supremacy among the departments, but co-ordination and co-equality—all supremacy residing in the people of the several States.

On this side of the Atlantic, our governments were organized by the people of the several States, by distributing those powers of peculiar character each to its appropriate body of magistracy. This distribution of itself involved the idea of *restriction,* but the framers of our State constitution were not content with merely doing this. That there might be no room for controversy or doubt, they emphatically prohibited the departments from exercising *any power* properly attached to another.

Can anything be more unlike than a parliament asserting a supreme power and its capacity to do whatever is possible, and the subordination of the other departments to its will, and a congress of the United States, with *limited* powers clearly enumerated, delegated as trusts by the people of the separate States, or of a State legislature, under a State constitution, limited in its powers, first by the constitution of the United States, by the State constitution in the distribution of powers, and then by fundamental principles enumerated in bill of rights, and other fundamental principles so axiomatic and indisputable as not to require specification?

Hence it is that from this prolific source of error, the mistaken idea of supremacy, the Congress and our State legislatures are constantly overleaping the constitutional barriers

12

erected with such foresight and care. The encroachments at first are insidious, and being silently made, excite no alarm; one precedent of usurped power becomes the parent of another, and so on indefinitely, until at length the progeny becomes so numerous, that to check their further increase becomes impossible, except through violent revolution.

To this mistaken idea of legislative power can be ascribed only the retroactive legislation which fills our statutes. Upon fundamental principles, retrospective laws affecting acquired rights or existing remedies for injuries, are condemned by the universal sentiment of all great publicists.

The principle upon which *ex post facto* laws are denounced is the same upon which the world unites in condemning retrospective laws which affect the interests of the citizen. Not leaving them, however, to be met and counteracted by this universal sentiment of justice, the framers of the constitutions of Georgia of 1861 and 1865, wisely prohibited them.

The power claimed and exercised by the legislature in the passage of the acts of 1866, is a power to control the entire administration of justice by the Courts in the modes prescribed by existing laws; it is a power over the suitor, and violates the consecrated principles of English liberty in this, that it denies to him justice and his right, and delays the redress of injuries sustained, which amounts to a denial of justice, until legislative pleasure shall order otherwise. Such legislative power cannot exist in a government like ours; it is utterly inconsistent with the principles on which it was founded. If such usurpations are tolerated, legislatures are despotic, governments are subverted, anarchy ensues, or all power becomes concentrated in one department—not in the hands of one tyrant, but in the hands of hundreds of tyrants.

In March, 1861, when on the bench of the Superior Court of the Ocmulgee circuit, on a rule against the sheriff of Putnam for not levying a *fi. fa.*, in his return to the rule he set forth that he was prohibited by the stay-law then among our statutes. I held then as now, that the legislature could not, by any retrospective legislation, enjoin and prohibit the collection of the judgments of a Court; that it was the exercise

Aycock, *et al.*, *vs.* Martin, *et al.*

of a judicial power, and denied by the constitution to the legislature.

That view of the then stay-law applies with equal force to the acts of 1866.    Subsequent reflection has only deepened my convictions of its soundness.

The decision referred to was made on a new ground; it suggested itself to my mind from the impression made by the clauses of the State constitution at the head of this branch of my opinion.    No precedent was produced, no argument was had,—I did not then know of its having been considered by any other Court.    Almost simultaneously, as I have since learned, a very eminent Judge (Chief Justice Pearson, of the Supreme Court of North Carolina) took a very similar view to the one which controlled my judgment, in pronouncing the opinion of the Court upon act of the legislature of North Carolina, providing against the sacrifice of property, and suspending proceedings in certain cases.    I have not the report of the case in my library, so as to give extracts ·from it to show the coincidence which, I have been told by a very distinguished member of this bar, exists; but through his politeness, I have been enabled to refer those who desire to explore this field of enquiry, to the case of Barnes vs. Barnes, 8th volume of Jones' Law Reports North Carolina, p. 366.

Keeping in view the clauses of the State constitution quoted, the enquiring mind is instinctively led to ask, whence does the legislature derive its authority by its stay-laws to *enjoin* the levy of executions antecedently issued?    Whence to forbid a ministerial officer of the Court from obeying the mandates of the Court issued to enforce its judgments and decrees?    Whence to impose penalties on such officer for his obedience to the Court and to his oath of office?    Whence to relieve him from the obligations of his oath of office, from his liability to plaintiffs in execution on his bond; or to relieve his securities from the liability they have incurred by his failure to perform the duties imposed by his oath and secured by his bond?    Whence the power of the legislature to require a judgment of a Court in a civil case, for an entire sum of money, to be enforced only by annual installments?

Whence the power to impose new burdens and conditions upon existing process? Whence to divest the lien of judgments on the movable property of defendants, by allowing the debtor to carry it from one county to another for sale, and to pocket the proceeds? Whence to prohibit a levy on said property so being removed, unless the creditor will make a specific oath? Whence the power to divest a plaintiff in execution of his legally acquired right to the execution itself, it being by law his property and under his control, with the right to levy and enforce it according to its terms? In fine, if the legislature may rightfully thus act upon and alter civil judgments and executions, why may they not alter and modify criminal judgments and the warrants thereupon issued for their enforcement? The power to do the first is a power which will authorize the last.

These and many other questions can but suggest themselves to the constitutional lawyer, and they cannot be answered but upon the false assumption which pervades the reasoning of those who defend such acts of usurpation—of the unlimited power of the legislature over remedies.

Such collisions between the lawful exercise of the legitimate powers of the Courts in the administration of justice, the fruits of the acts of 1866, could not possibly have arisen but by the legislature overleaping the barriers of the constitutions, exercising prohibited powers—powers which not only do not belong to them, but could not be given to them without making legislative will supreme—concentrating, indeed, *all powers* whatever in that department, and subverting the constitutions themselves.

The logical conclusions, therefore, to be drawn from these clauses of the State constitution, are that the legislature cannot enjoin the officers of a Court from the performance of the mandates of the Court, or in any manner interfere with the enforcement of the judgments of the Court by legislative action, direct or indirect, on the plaintiffs in execution, the sheriff or the Court, and that all retroactive laws, enacted to accomplish any of these ends, are palpable usurpations of power, violative of the constitution itself, and if not promptly

and firmly arrested by the Judiciary, when called on to construe them, will lead to the overthrow of our present form of government.

In concluding this opinion, I deem it proper to add that I am profoundly sensible of the excited condition of the public mind, phrenzied by anxiety for relief from threatened poverty and ruin. It is impossible for any man who has a heart and warm sympathies for kindred and race, to look upon our citizens, distressed and despondent as they have been made by the terrible desolation of unsuccessful war and the evils which followed its termintion, pressing heavily on their energies, their pride, their hopes, without feeling an anxious wish to respond to their cries for succor.

*There is no power in a Court to give any relief whatever.* A Court sits to interpret and apply at all times and to all persons, with equal justice, the constitutions and laws of the land to cases brought before it.

The constitutions were adopted, it would seem, by the people when they were rational, to protect themselves against the madness of their passions. Obedience was required to those constitutions of their agents, and, not trusting or confiding alone in their integrity, the people superadded a solemn oath to be taken by those agents to support these constitutions, in order to obtain thereby the fullest assurance that their expressed will should be observed at all times.

I know full well the danger of resisting popular feeling. I have calmly measured it and prepared my mind to meet the usual fate of those who obey the stern dictates of duty. I love reputation, and it is perhaps the deep love I have for that that is unsullied, that has given me firmness to resist the storm which howls around. Compliance with popular clamor would probably have kept me buoyant on the mad current and made me a favorite for the moment. I will not—my nature forbids me to—attempt to retain public favor by personal dishonor, by what I can regard as nothing else than deliberate, willful perjury.

I am a sworn sentinel, placed here to defend the constitu–

tions of the United States and of Georgia from attack from every quarter. I will fall at my post, if necessary.

Within a few years past, I read somewhere a narrative of the workmen who were engaged near the gates of the city of Pompeii having discovered the skeleton of a Roman soldier, who, near two thousand years ago, had died at his post, whilst the inhabitants had mostly escaped by flight. Imbedded in the *scoriæ* from Vesuvius, it was found erect, armed with javelin and sword and helmet and shield, where he had been placed as a sentinel. Unrelieved, remembering his military oath, facing and meeting death, he perished where his remains have been found, in the performance of duty. This fact, so sublime in the suggestions which it must perpetually awaken, will continue forever to teach, in a language all can understand, to every man engaged in public service, whatever consequences may betide him personally, the first and last lesson of life is, obedience to duty.

Let the judgments in said cases be affirmed.

WARNER, C. J. concurring.

WALKER, J. dissenting.


WALKER, J. dissenting.


These four cases all involve the constitutionality of the " stay-law," and no other question was considered in either of them.

Is a " stay-law " constitutional? I have labored more to be able to answer this question correctly, than any question ever submitted to me for decision; and according to the judgment of the Court, I have failed to do so. While on the Superior Court bench, at March Term, 1861, of Bartow Superior Court, in the case of B. H. Conyers vs. A. M. Franklin, sheriff, the question was presented precisely as now, and with the lights then before me, I rendered this judgment: " Upon hearing the cause shown, it is ordered by the Court that the rule *nisi* be discharged, it being the opinion of the Court that the act referred to in the showing, (the stay-law of 1860,) is constitutional." This decision was

excepted to, but the writ of error was withdrawn after it was filed in the Supreme Court.    At March Term, 1862, of the same Court, in the case of Conyers vs. Aycock, sheriff, the same question was again presented, and, as I understood, for the avowed purpose of having a decision upon it by this Court, and upon a re-argument and review of the question, I again ruled in terms that the "stay-law" is constitutional. Exception was taken to this ruling, the case brought to this Court, and I understand was argued, or partially argued at least, and then withdrawn without a decision, so that the question with me is not new, and my opinions have not been hastily formed. I have had ample time and means to review and correct them if erroneous; for at the June Term, 1866, of this Court, the question was most elaborately and exhaustively argued by some of the ablest lawyers in the State. The view which the Court took of the case then before it, rendered a decision of this question unnecessary.    Believing that a decision would have to be made, I have occasionally been examining the question ever since ; and if the conclusion to which I have come be erroneous, it is not my fault ; because I have used all the means in my power to try to understand truly the question submitted.    I regret that on a great constitutional question the Court should be divided ; and the fact that my learned brethren think the law unconstitutional, has made me the longer hesitate in forming my opinion finally in opposition to theirs.    But having considered all the reasons on both sides of the question, as well as I am able, my mind is fully satisfied, and I am forced, however reluctantly, to dissent from the judgment rendered in these cases. This in Georgia is an open question.    No case has been decided, which is binding on this Court as "authority."    In Curtis' Commentaries on the Jurisprudence of the Courts of the United States, section 255, he says: "A careful examination of the cases will show that the subject is still left in a distressing conflict of opinions, and requires to be re-examined upon principle and analogy."    So then we are free to decide according to our own convictions of what the law is.

Cases have been decided by the Supreme Court of the

United States, upon the powers of the States, and in the opinions of Judges in some of those cases, are many *dicta* bearing upon the question now under consideration; but I find no case where it has been decided by that Court, and it has not been decided by our own Court. The decisions of our sister States have been conflicting. As I understand the cases, North Carolina, South Carolina, Alabama, Tennessee, and Mississippi have decided the law to be unconstitutional; while Pennsylvania, Iowa, Wisconsin, Maine and Kansas have held it constitutional. In several of the decisions on both sides of the question, there are dissenting opinions. Perhaps upon no question does there exist a greater diversity of judicial opinion than upon this. Such being the case, it is not surprising that our Court should be divided upon it.

It is exceedingly difficult for us to get rid of the influence of those to whom we have long been accustomed to look for guidance. Our late Chief Justice, who loved to be styled, as he really was, the "Father of the Georgia Bar," wielded almost a boundless influence; and a knowledge of what were his impressions of any important question, would naturally do much towards moulding the opinions of those accustomed, for more than twenty years, to regard him as the great exponent of the law. We have so long regarded him as the oracle of the law, that his authority is almost irresistible. On the other hand, however, we have our present able and learned Chief Justice, with his clear, cold, hard logic and massive rhetoric, demonstrating with almost unanswerable argument, the opposite view of the question; and he is sustained by the profound common-law-lawyer associated with us on the bench. When our guides through the difficult mazes of the law disagree, we are necessarily thrown upon our own resources, and must for ourselves determine what is best sustained by authority and reason.

This Court is asked to set aside an act of the legislature—a co-ordinate department of the government—to declare void a series of acts, upon the ground that the law-making power has transcended the limits prescribed to it by the constitution. While it is now almost universally admitted that Courts

have this power, yet it is a power which should be exercised with great caution. If a law be clearly unconstitutional, the Courts should so declare, regardless of consequences. Yet it is the duty of the Court before doing so, particularly to compare legislative acts with both the State and Federal constitutions, and if possible, to reconcile the one with the other. Winter vs. Jones, 10 Ga. R., 195. In Van Hoffman vs. The City of Quincy, 4 Wallace Rep. 549, decided in 1866, the Supreme Court of the United States says: " The question to be determined is, whether the statute in this respect is valid ; or whether the legislature transcended its power in enacting it. The duty which the Court is called upon to perform is always one of great delicacy, and the power which it brings into activity *is only* to be exercised in cases *entirely free from doubt."* In Cary vs. Giles, 9 Ga. R., 258, our own Court says: "If the constitutionality of the acts of 1832 and 1833 was *the least* doubtful, it would be our duty to carry them into effect. To set them aside, their repugnancy to the constitution should be most manifest. It is contrary to the practice and policy of this Court, as it should be of all others, rashly and lightly to pronounce void a solemn act of the government; the case must be clear to justify it." Again, in Boston vs. Cummins, 16 Ga. R., 105, this Court says: " Acts of the legislature are not only presumed to be constitutional, but the authority of the Courts to declare them void, will never be resorted to, except in a clear and urgent case—one which is directly in the teeth of the constitution— as if the Legislature were to vest the executive power in a standing committee of the House of Representatives ; one which requires no nice critical acumen to decide on its character, but which is as obvious to the comprehension of any person as an axiomatic truth—as that all the parts are equal to the whole, or that two and two make four." In Cooper vs. Telfair, 4 Dallas Rep., 19, Mr. Justice Paterson, in speaking of a statute of Georgia banishing certain persons from the State and confiscating their property, says: " To authorize this Court to pronounce any law void, it must be a

*clear* and *unequivocal* breach of the constitution, not a doubtful and *argumentative* application."

In Grimball vs. Ross, from Liberty Superior Court, November Term, 1808, reported in 2 Hall's Law Journal, p. 93, Charlton, Judge, says : "The Judicial department should declare an act unconstitutional only when it is directly in the teeth of the constitution. No nice doctrines, no critical exposition of words, no abstract rules of interpretation, such as may fit the elucidation of principles in a legal contest between individuals, can, or rather ought to be resorted to, in deciding on the constitutional operation of a statute.   The violation of a constitutional right ought to be as obvious to the comprehension of every one as an axiomatic truth,—as that the parts are equal to the whole.   *   *   When the question remains *doubtful* whether the legislature have or have not trespassed upon the constitution, the conflict ought to be avoided, because there is a possibility in such a case of the constitution being on the side of the legislature."

These quotations show how very careful the Courts are in declaring void an act of the legislature, and how clearly must appear the conflict between the act and the constitution, to justify such action by the Court.

In 1860, the people, represented in the General Assembly, passed, over the executive veto, the first " stay-law."   This was re-enacted in 1861, in 1862, in 1863, and in March, 1865.   In November, 1865, the people, represented in convention, passed a " stay-law," " until the adjournment of the first session of the next legislature."   In March, 1866, the legislature passed the " stay-law," over the executive veto ; and again in December, 1866.   Perhaps a more settled policy on the part of the people could not be shown in favor of any measure, than is shown by these references in favor of a " stay-law."

Let us see what were the reasons for the adoption of this policy.   The preamble to the act of March, 1866, pamp., p. 241, says : " Whereas, during the late war, the State of Georgia has been overrun by the opposing armies ; the agricultural crops and agricultural stock in a great measure

destroyed ; the Confederate indebtedness held by the people, in exchange for their products, has become valueless ; the obligations of the State, eagerly sought after as a safe investment, have been repudiated ; the accumulated capital of nearly a century, represented by slave labor, amounting to nearly three hundred millions of dollars, has been destroyed, and the prospect of successful agriculture, the basis of all value, now dependent on the voluntary labor of the freedmen, is a question of doubt and experiment—therefore : the General Assembly of the State of Georgia do enact" a "stay-law." We know the state of things here described did in fact exist; and the people demanded time to enable them to recuperate their wasted estates, so as to enable them to meet their liabilities, without being deprived of the little remnant which had escaped the vicissitudes of the war. The law-making power, "the objections of the Governor to the contrary notwithstanding," responded favorably to the appeal from the people. Did the legislature do right ? In the great case of Ogden vs. Sanders, 12 Wh. Rep., 283, Mr. Justice Johnson says : "It is among the duties of society to enforce the rights of humanity ; and both the debtor and the society have their interests in the administration of justice, and in the general good—interests which must not be swallowed up and lost sight of while yielding attention to the claim of the creditor. The debtor may plead the visitations of Providence, and society has an interest in preserving every member of the community from despondency—relieving him from a hopeless state of prostration, in which he would be useless to himself, his family and the community. When that state of things has arrived in which the community has fairly and fully discharged its duties to the creditor, and in which pursuing the debtor any longer would destroy the one, without benefiting the other, must always be a question to be determined by the common guardian of both ; and in this originates the power exercised by governments in favor of insolvents. It grows out of the administration of justice, and is a necessary appendage to it." Again, on page 292, he says : "No one questions the duty of the government to

protect and enforce the just rights of every individual, over all within its control. What we contend for is no more than this, that it is equally the duty and right of governments to impose limits to the avarice and tyranny of individuals, so as not to suffer oppression to be exercised under the semblance of right and justice. It is true that in the exercise of the power, governments themselves may sometimes be the authors of oppression and injustice ; but whenever the constitution would impose limits to such power, it has done so ; and if it has not been able to impose effectual and universal restraints, it arises only from the extreme difficulty of regulating the movements of sovereign power, and the absolute necessity, after every effort that can be made to govern effectually, that will still exist, to leave some space for the exercise of discretion and the influence of justice and wisdom." Has the legislature, in the passing of the "stay-law," abused its "discretion," and acted contrary to "justice and wisdom ?" What are the powers of the legislature ? Our State constitution, article 2, section 5, paragraph 1, says : " The General Assembly shall have power to make all laws and ordinances consistent with this constitution, and not repugnant to the constitution of the United States, which they shall deem necessary and proper for the welfare of the State." In Boston vs. Cummins, 16 Ga. R., 113, it is said, " Our General Assembly, when acting within the pale of the constitution of the United States and of this State, has the same omnipotence ascribed to the British Parliament. It has sovereign and uncontrollable authority in making, confirming, restraining, abrogating, repealing, reviving and expounding of laws (Braddle vs. Brownfield, 2 Watts & Sergeant R., 271) concerning all matters of all possible denominations, (1 Bl. Com., 160.)" While it keeps within the constitutional restrictions, the only limit to the power of the General Assembly is what " they shall deem necessary and proper for the welfare of the State." A reference to the several "stay-laws" will show how very necessary the General Assembly deem, " for the welfare of the State," some provision to prevent the immediate execution of judgments rendered on liabilities created prior to June 1st,

1865.    The question is, has the legislature exceeded its con-
stitutional powers.    In the language of the Supreme Court
of the United States, is the question " entirely free from
doubt;" is it " a clear and unequivocal breach of the consti-
tution, not a doubtful and argumentative one;" or, as our
own Court expresses it, " is the repugnancy to the constitu-
tion most manifest?"    Is this is " a clear and urgent case—
one which is directly in the teeth of the constitution; one
which requires no nice critical acumen to determine its char-
acter, but which is as obvious to the comprehension of any
person as an axiomatic truth?"    If so, it is our duty to
declare the act void.

It is insisted that the " stay-law " violates the clause of the
constitution of the United States and of our own State,
which prohibits the State from passing any law " impairing
the obligation of contracts;" and also the clause in the State
constitution which prohibits the passage of " retroactive laws
injuriously affecting any right of the citizen."    Courts and
Judges have expressed various and irreconcilable views upon
what legislation is in conflict with the first clause named.    Some
hold the broad doctrine that the obligation of contracts consists
in the remedy which the laws give for the enforcement of the
contract when broken; and that therefore the remedy cannot
be impaired without also impairing the obligation to the
same extent.    In other words, that the *lex loci contractus*
enters into and forms a part of the contract, and gives " a
right to enforce the performance by the remedies then in
force."    Mr. Justice Baldwin, in McCracken vs. Hayward,
2 How. R., 612, seems to take this view of the question.    So
also does the Supreme Court of Kentucky; Blair vs. Wil-
liams, 4 Litt. R., 34; Lapsley vs. Brashears, *ib.* 49; McKin-
ney vs. Carroll, 5 Mon., 98.    The constitution of New
Jersey contains a similar declaration.    If this view of the
question be the correct one, the legislature has no power
over the remedy at all, and can make no change in the pro-
ceedings to enforce contracts, however satisfactory the changes
might be, and however necessary it might be for the welfare
of the State.

Another class of Courts and Judges take the opposite extreme, and hold that the legislature may modify the remedy in regard to existing contracts at their discretion. Of this class is Mr. Justice McLean, in Bronson vs. Kenzie, 1 How. R., 326–7; and Cook vs. Moffat, 5 Howard's Rep., 311; Evans vs. Montgomery, 2 Watts & Sergeant Rep., 220, (Pa.) Reade vs. Frankfort Bank, 10 Shepley, 318, (Maine); 6 do., 109. Woods vs. Buie, 5 How. (Miss.) R., 285. Iverson vs. Shorter, 9 Ala. R., 713. Catlin vs. Munga, 1 Texas R., 598. Fisher vs. Lackey, 6 Blankf. R., 373, (Ia.)

A third class, and perhaps the larger one, adopt a view between these extremes, and hold that legislation on the remedies of prior contracts is constitutional, provided the modification of these remedies still leaves substantial and efficient means of enforcing them. 2 Par. on Con., 535; and cases cited. This shows the great diversity of opinion which exists among jurists as to the powers of the legislature under this clause of the constitution. Any one who will read the 150 pages of the case of Ogden vs. Saunders, 12 Wh. Rep., will see how many different views are expressed; and it will be seen that of the majority of the judges who concurred in the decision, scarcely any two gave the same reason for the opinion; and yet the *dicta* in this case, and of the cases founded on these *dicta*, are the foundation of most of the decisions adverse to the constitutionality of a "stay-law," although the question of a "stay-law" was not at all involved in the case, in any way.

In Sturges vs. Crowninshield, 4 Wh., 199, Chief Justice Marshall says: "The distinction between the obligation of a contract and the remedy given by the legislature to enforce that obligation, has been taken at the bar, and exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct. Confinement of the debtor may be a punishment for not performing his contract, or may be allowed as a means of inducing him to perform. But the State may refuse to inflict this punishment, or may withhold this means and leave the obligation in full force. Imprison-

ment is no part of the contract, and simply to release the prisoner does not impair its obligation." Mr. Justice Johnson, in Ogden vs. Saunders, 12 Wh., 287, says : " The right of the creditor to the aid of the public arm for the recovery of contracts, is not absolute and unlimited, but may be modified by the necessities or the policy of societies." In the same case, on page 349, Chief Justice Marshall says: " Counsel for plaintiff in error insists that the right to regulate the remedy and to modify the obligation are the same ; that obligation and remedy are identical ; that they are synonymous—two words conveying the same idea. The answer given to this proposition by defendant's counsel seems to be conclusive. They originate at different times. The obligation to perform is coeval with the undertaking to perform ; it originates with the contract itself, and operates anterior to the time of performance. The remedy acts upon a broken contract, and enforces a pre-existing obligation.  *  *  Contracts have consequently an *intrinsic* obligation.  *  *  Obligation, then, and remedy are not identical ; they originate at different times and are derived from different sources," p. 350.  " It has been shown that the obligation is distinct from the remedy, and it would seem to follow that law might act on the remedy without acting on the obligation. To afford a remedy is certainly a high duty of those who govern to those who are governed. But the constitution has not undertaken to enforce its performance.  * . *  Its language is the language of restraint, not of coercion. Should a State be sufficiently insane to shut up or abolish its Courts, and thereby withhold all remedy, would this annihilation of remedy annihilate also the obligation of contracts? We know it would not. If the debtor should come within the jurisdiction of any Court of another State, the remedy would be immediately applied, and the *inherent* obligation of the contract enforced. This cannot be ascribed to a renewal of the obligation, for passing the line of a State cannot re-create an obligation which was extinguished. It must be the original obligation of the parties, and which exists unimpaired though the remedy was withdrawn," p. 351.  Again, " We

perceive then no reason for the opinion that the prohibition to pass any law impairing the obligation of contracts is incompatible with the fair exercise of that discretion which the State legislatures possess, in common with all governments, to regulate the remedies afforded by their own Courts. We think that obligation and remedy are distinguishable from each other; that the first is created by the act of the parties— the last is afforded by the government. The words of the restriction we have been considering, countenance, we think, this idea. No State shall pass any law impairing the obligation of contracts. These words seem to us to import that the obligation is *intrinsic;* that it is created by the contract itself, not that it is dependent on the laws made to enforce it. * * *. Contracts possess an original intrinsic obligation, derived from the acts of free agents, and not given by the government. We must suppose that the framers of our constitution took the same view of the subject, and the language they have used confirms this opinion," pp. 353–4.

For myself, I must confess I never have been able to understand how the remedy, which the law provides to enforce the stipulations of a broken contract, can impair the obligation of contracts, which is the creation of the parties to the contract. Remedy may be incident to contracts, but how a law which simply affects that remedy by suspending for a reasonable time the enforcement of compensation for a violated contract, without in any way touching the contract itself, impairs the obligation, is to me incomprehensible. I do not know how the remedy becomes a part of the contract at all. According to the argument, it would seem that in some way or other, the remedy, which is provided by law, is infused into the obligation of the contract, which is the act of the parties, and then a change of the remedy, or a suspension of it for a reasonable time, impairs the obligation. I understand that the supreme power in the State can regulate the time, the mode and the manner of enforcing contracts, though it can pass no law to impair their obligation. It may prescribe imprisonment for debt, and abolish imprisonment for debt; may establish Courts of law and equity, and com-

bine the two, as it has virtually done in this State; may regulate the time and order of the sittings of the Courts in the different circuits, and change them at will. All these things, in a greater or less degree, interfere with the remedy but do not impair the obligation. See the able dissenting opinion of Aldrich, J., in the case of The State vs. Carew, 13 Richardson's S. C. R., 524. The right to regulate the remedy in its own Courts, must be incident to each State, which may modify and change it as the welfare of society may require; and as a consequence of this, a law changing or affecting the remedy only is not considered as impairing the obligation of the contract." Forsythe vs. Marbury, R. M. Charlton's Rep., 331. Every change or modification of the remedy does not impair the obligation of contracts. The Legislature may vary the nature and extent of the remedy, so always that some substantive remedy be in fact left. Wilder vs. Lumpkin, 4 Ga. R., 220; 2 Sto. on the Con., sec. 1385; James vs. Strell, 9 Barb., N. Y. Rep., 482. "The obligation of a contract is one thing, the remedy to enforce it another. And whilst the former cannot be impaired, the latter may generally be left to the sound discretion of the Legislature." Griffin vs. McKenzie, 7 Ga. R., 166; (citing 3 Dallas Pa. Rep., 386; 7 Johnson's Rep., 447; 2 Gallis cir. ct. Rep., 102; 4 Wh. Rep., 122; 12 Wh. Rep., 349; 3 Pet. Rep., 280). "The remedy or mode and manner of enforcing contracts have never been considered as a part of their obligation, and have always been deemed within the Legislative control." Cary vs. Giles, 9 Ga. Rep., 258. It is now clearly established by repeated decisions that the Legislature may pass laws altering, modifying, or even taking away remedies for the recovery of debts without incurring a violation of the clause in the Constitution which forbids the passage of *ex post facto* laws, or laws impairing the obligation of contracts." Evans vs. Montgomery, 4 Watts & Seargent Rep., 220. " This obligatory force (of contracts) is not so much the result of the positive declarations of the municipal law, as of the general principles of natural, or as it is sometimes called, universal law. In a state of nature,

13

independent of the obligations of positive law, contracts may be formed, and their obligatory force be complete.    Between independent nations treaties and compacts are formed which are deemed universally obligatory ; and yet in no just sense can they be deemed dependent on municipal law.    Nay, there may exist (abstractly speaking) a perfect obligation in contracts when there is no known and adequate means to enforce them.    *    *    In this predicament are the United States, who are not sueable on any contract made by themselves, but no one doubts that they are still obligatory on the United States.    Yet their obligation is not recognized by any positive municipal law in a great variety of cases. It depends altogether upon principles of public or universal law.    Still, there is in these cases a right in the one party to have the contract performed, and a duty on the other side to perform it.    But generally when we speak of the obligation of contracts, we include in the idea some known means acknowledged by the municipal law to enforce it.    When all such means are absolutely denied, the obligation of the contract is understood to be impaired, though it may not be completely annihilated.    Rights may indeed exist without any present adequate correspondent remedies between private persons." 2 Story on the Con., sec. 1381.    " The civil obligation of a contract, then, though it can never arise or exist contrary to positive law, may arise or exist independent of it; and it may exist notwithstanding there may be no present adequate remedy to enforce it.    Whenever the municipal law recognizes an absolute duty to perform a contract, then the obligation to perform it is complete, although there may not be a perfect remedy." 2 Story on Con., 1382.    In Morse vs. Gould, 11 N. Y. Rep., 286, Denis, J., says : " Legal remedies are in the fullest sense under the rightful control of the Legislatures of the several States, notwithstanding the provision in the Federal Constitution securing the inviolability of contracts ; and it is no valid objection on that subject that the substituted remedy is less beneficial than the one which obtained at the time the debt was contracted."    In McCormick vs. Rush, 3 Am. L. Register, 99, the Supreme

Court of Iowa says : "The argument of Mr. Justice McLean, in his dissenting opinion in the case of Bronson vs. Kinzie, 1 How. Rep., 311, is, in my opinion, unanswerable, and gives a construction to the language of the Constitution which is plain and intelligible, which any mind sophisticated or unsophisticated (to use the language of Mr. Dallas), can understand. Every mind and every case to be found recognizes a clear distinction between the obligations of a contract and the remedy. And to attempt to draw the dividing line, and to say that the Legislature may change some parts of remedial statutes and not others, or that some such changes affect the obligation, and are therefore invalid, while others do not, and are therefore valid, leads to confusion; leaves courts and the public in a wild field of uncertainty, without a reliable chart or compass, and necessarily involves the decisions of the several States in inconsistencies; each Court being apt to determine, under the sweeping language of the leading cases, whether existing remedies have by the new statute been preserved in substance and with integrity. It seems to me that no one can refer to all the decisions made and reconcile them." To show the justice of these remarks, one has but to examine these cases, and they are the leading ones, too—Bronson vs. Kenzie, 1 How., 311; McCracken vs. Hayward, 2 do., 608; Sturges vs. Crownin-shield, 4 Wh. 122; Ogden vs. Saunders, 12 Wh., 213 to 370; Green vs. Biddle, 8 Wh., 1; Mason vs. Haile, 12 Wh., 370; Jackson vs. Lampkin, 3 Ret., 280; Crenan vs. The State of Arkansas, 15 How., 319; Planters' Bank vs. Sharp, 6 How., 301; Bank of Alabama vs. Dalton, 9 How., 522; Satterlee vs. Matthewson, 2 Pet. Rep., 380; McMillan vs. McNiel, 4 Wh., 209; Cook vs. Moffatt, 5 How. R., 295; Boyle vs. Zachry, 6 Pet. R., 643; Beers vs. Haughton, 9 Pet. R., 329.

It is exceedingly difficult, if not impossible, to deduce any general rule from these cases as to the restrictions imposed upon the legislative power by the clause under consideration. I think no intelligible general rule can be deduced from all the cases. They do not define where "remedy" stops and

"obligation" begins. I can understand that the law of the place of the contract acts upon it and governs its construction, validity and obligation, but I do not understand how the law can constitute any part of the contract. 2 Sto. on the Con., sec. 1384. If the law does not constitute a part of the contract, I cannot see how a change of the law can be said to impair the obligation of the contract. "Remedies are a consequence of contracts when broken:" Sto. on confl. of laws, sec. 336. And it is universally admitted and established, that the forms of remedies and modes of proceeding, and the execution of judgments are to be regulated solely and exclusively by the laws of the place where the action is instituted: Sto. on confl. of laws, sec. 556, 557, 558 and 568. But how can this be, if the laws of the place of the contract enter into and form a part of the contract? If these laws enter into and form a part of the contract, they must necessarily accompany it every where, when an attempt may be made to enforce the contract.

I had intended to quote from a number of other cases, but owing to the length of this opinion I must omit many. I will, however, add another citation here. In 1808, the Legislature of Georgia passed "an act to alleviate the condition of debtors, and afford them temporary relief." Clayton's Dig., 426. This act prohibited the issuing of any execution for a stipulated time, upon the defendant giving security. It was insisted the law impaired the obligation of contracts. Judge Charlton, in Grimwal vs. Ross, 2 Hall's Am. Law. J. 99, says, "what is meant by the terms 'impairing the obligation of contracts?' Any measure, I should suppose, which lessens the value of contracts, that gives them a diminished dignity, takes from them any of the properties of contracts, or which divests them of any priority of lien, obligation, or recovery, which they would otherwise possess. This impairing of contracts must mean their partial rescindment by legislative authority. This act, therefore, as it does not innovate upon the obligation of contracts, either by a partial rescindment, by destroying any of the properties of contracts, or by diverting the usual operation of the lien, cannot be

said to impair the obligation of contracts.   The usual periods at which contracts were heretofore enforced by action are protracted; the facilities of recovery have been suspended. But does this impair the obligation of contracts?   Certainly not.   Their *obligation* remains entire, and a bond or covenant is as valuable, and on the score of obligation is as appreciative now, as before the passing of the act."

Under these impressions of the obligations I have thus noticed, I am therefore of opinion, (bottoming my opinion upon these specific objections,) that the act is *constitutional.*" See Von Baunback vs. Bade, 9, Wisconsin Rep., 559, particularly the opinion of Judge Payne; Chadwell vs. Moore, 8 Watts and Sergt. Rep., (Pa.) 49 ; Brietenback vs. Bush, 8 Wright's Rep., 313; and Cox vs. Martin, Wright's Rep., 322, (Pa.); also, Clark vs. Martin, 13 Wright, 299 ; 16 Mass. Rep., 360; 18 Maine Rep., 109; 5 Howard's (Miss.) Rep., 285 ; 23 Maine Rep., 318; Drexell vs. Miller, 13 Wright, 246 ; 6 Blackf. (Ia.) Rep., 374.

As illustrating the powers of the legislature we may refer to what eminent Judges have said on the subject of exempting certain property from execution for debts contracted, and judgments rendered, previous to the exempting act.   In Von Hoffman vs. The City of Quincy, 4 Wallace Rep., 553, Mr. Justice Swayne delivering the opinion of the Court, says, "the right to imprison for debt is not a part of the contract.   It is regarded as penal rather than remedial. The States may abolish it whenever they think proper.   They may also exempt from sale, under execution, the necessary implements of agriculture, the tools of a mechanic, and articles of necessity in household furniture."   In 2 Parsons on Con. p. 534, the author says : "It is admitted that a State may make partial exemptions of property, as of furniture, food, apparel, or even a homestead."   Chief Justice Taney, in Bronson vs. Kinzie, 1 How., 315, says: "If the laws of the State passed afterwards had done nothing more than change the remedy on contracts of this description, they would be liable to no constitutional objection.   For undoubtedly, a State may regulate at pleasure the modes of proceed-

ing in its Courts in relation to past contracts as well as future. It may, for example, shorten the period of time within which claims shall be barred by the statute of limitations.    It may, if it thinks proper, direct that the necessary implements of agriculture, or the tools of a mechanic, or articles of necessity in household furniture shall, like wearing apparel, not be liable to execution on judgments.    Regulations of this sort have always been considered, in every civilized community, as property belonging to the remedy, to be exercised or not, by every sovereignty, according to its own views of policy and humanity.    It must reside in every State to enable it to save its citizens from unjust and harassing litigation, and to protect them in those pursuits which are necessary to the existence and well being of every community.    And although a new remedy is deemed less convenient than the old one, and may in some degree render the recovery of debts *more tardy and difficult,* yet it will not follow that the law is unconstitutional."    In Bigelow vs. Pritchard, 21 Pickering (Mass.) Rep., 169, Putnam, J., says : "It would not be contended, as we suppose, that the Legislature may not lawfully exempt a part of the property of a debtor from attachment or levy on execution ; for example, articles of furniture, beds, bedding, etc., necessary for the debtor and his family.    To that extent the remedy to enforce payment is diminished rightfully."   See, also, Rockwell vs. Hubbell, 2 Douglas (Mich.) Rep., 197 ; Helfeinsten vs. Cave, 3 Iowa Rep., 287 ; Casie vs. Douglas, 2 Kansas Rep. ; Morse vs. Gould, 1 N. Y. Rep., (1 Kernan) 281 ; Newell vs. Hayden, 8 Iowa Rep., 140.    In Casie vs. Douglas, *supra,* the Court bases its decision upon the *dictum* of Chief Justice Taney, in Bronson vs. Kinzie, *supra,* and adds, "It is just as essential to the well being of a community that the people have houses to live in as that they have tools and implements to work with.    The principle that authorizes the exemption of the one must necessarily include the other."

These quotations are made for the purpose of showing that some who even deny the powers for which I contend, not only admit that the legislature may relieve the person of the

debtor from imprisonment, but go farther, and admit that portions of his property, also, may be exempt from execution under pre-existing judgments; and still the law will not impair the obligation of contracts. To my mind this gives a larger scope for legislative powers than is necessary to uphold a "stay law." What I contend for is, that the legislature, when it may deem it for the welfare of the State, shall have power to suspend, for a reasonable length of time, the remedy which it has furnished for the enforcement of compensation for broken contracts; not to impair the obligation of contracts, but simply to say that for one year we will not authorize an officer to levy on the property of judgment debtors, and at that time he may collect one third of the amount due; another third twelve months thereafter; and the balance in twelve months after that. No liens are to be released or displaced; all the property of the debtor remains bound as before for the payment of his debts; the statute of limitations is suspended in the meantime, so that judgment creditors shall suffer no detriment. All I contend for is the right of the supreme power in the State—the law making power—to withhold its arm from the creditor until the people, by industry and economy, may have a little time to recover from the devastations of a war unparalleled in modern times; and, which swept over Georgia from Dade to Chatham, leaving everywhere lonely chimneys as sentinels to tell of the ruin brought on the country. I insist that such legislation, under the circumstances existing in our State, is just such as Chief Justice Taney referred to when he said: "It must reside in every State to enable it to save its citizens from unjust and harrassing litigation; and, to protect them in those pursuits which are necessary to the existence and well-being of every community." The legislature has not interfered with the obligation of the contract—that remains unchanged. It has simply suspended for a given time the application of the remedy. Such legislation was deemed necessary for the public welfare; and in my opinion the law making power did not transcend its constitutional limits; did not thereby impair the obligation of contracts.

It would be interesting to examine the leading cases, relied on by those maintaining the other side of this question, but I can only glance at them now. In Sturges vs. Crown-inshield, the question related to a law discharging the con-tract. It was held that a state insolvent or bankrupt law was inoperative as to contracts which existed prior to its pas-sage. In Ogden vs. Saunders, the question was as to the effect of such a law upon a subsequent contract. It was adjudged to be valid, and a discharge of the contract according to its provisions was held to be conclusive.

In Green vs. Biddle, the controversy grew out of a com-pact between the States of Virginia and Kentucky. The Legislature of Kentucky passed certain laws violative of this compact, and the Court declared them void. In Bronson vs. Kinzie, there was a mortgage containing a power of sale. Subsequently the legislature required mortgaged premises to be sold for not less than two-thirds their appraised value, and allowed the mortgagor a year after the sale to redeem. This was held to be unconstitutional. In McCracken vs. Hayward, it was held that an appraisement law, prohibiting the sale of personal property, under execution, for less than two-thirds of its appraised value, so far as it affected prior contracts, was void.

These are the leading cases, and the question of a "stay law" was not involved in any one of them; yet it is in the *dicta* of Judges in these cases that the "authority" is found to set aside a series of acts of the Legislature, running through a period of six years.

As to the case of Wilder vs. Lumpkin, in our own Court, the opinion says, "The Legislature did not, as we think, intend this act to have any retroactive effect." 4 Ga. R., 210. So that all the learning of that case is merely *obiter*. In the Justices, etc.,vs. Selman, 6 Ga. R., 439, a rule is quoted from Smith's Com., 382, which is regarded as opposed to a "stay law." Without arguing that question, it is sufficient to say that no decision was made at all affecting the question. The question there before the Court was whether certain persons

were liable as sureties on a guardian's bond or not. That was the question decided, and nothing more.

It is insisted, however, that the "stay law" is obnoxious to the clause in the constitution which prohibits "retroactive laws injuriously affecting any right of the citizen." This clause was not in our constitution prior to 1861. It was then inserted, and with a slight verbal alteration, retained in the constitution adopted in November, 1865. Why was this clause added to our constitution? By the old law, as declared by the Supreme Court of the United States, Caldwell vs. Brett, 3 Dallas Rep., 393, the States were not prohibited by the constitution from passing retroactive laws, except they should thereby impair the obligation of contracts. Freeborn vs. Smith, 2 Wallace R., 174. "Retroactive laws, however unjust, are forbidden by the constitution of the United States only when they impair the obligation of contracts." Curtis' Com. Ju. U. S. Cts., sec. 252. Doubtless the clause under consideration was added to the constitution to prevent the legislature from divesting vested rights; to extend to this class of rights the same protection and restrictions as had been provided to preserve the inviolability of contracts Peck's (Tenn.) Rep., 17. That it was intended to apply to and protect vested rights only, was decided in effect by this Court at the last June term, in the case of O'Kelly vs. The Athens Manufacturing Company. In that case, O'Kelly had brought a *qui tam* action to recover a penalty for which the corporation had made itself liable. By the commencement of the action an informer acquires an "inchoate right." Bk. St. Mary's vs. The State, 12 Ga. R., 475. The legislature after the bringing of the action, repealed the law under which the penalty was incurred, and remitted the penalty, and this Court held that the cause of action was gone. O'Kelly insisted that the constitution protected "any right," but was answered that it meant any vested right, and that, although he had an "inchoate right," it was not such a "right" as the constitution protected against "retroactive laws." Here, at the invitation of the legislature, O'Kelly had employed counsel, became liable for both fees and cost, had instituted

his action, which authorized him to prosecute it to the exclusion of all others; and under the law, was entitled to one-half the penalties, for which the corporation was liable; had acquired an "inchoate right;" yet he was turned out of Court by the operation of a "retroactive law." How much stronger is O'Kelly's case than the one we are considering. In his case, his "inchoate right" was not only "injuriously affected" but he was entirely deprived of all "right" by the "retroactive" repealing statute.

I observe, in looking over the opinion as written out in O'Kelly's case, that the decision is placed almost exclusively on the ground that the suit was not brought in the proper name. It is true that the decision was placed on this ground, but I am sure my learned brethren will agree with me in stating that the other point was considered and decided as herein stated; and they will also recollect how reluctantly I concurred in that decision. In fact, I reserved the right to dissent, if, upon examination and reflection, I could not bring myself to agree with them. Upon further reflection, I concluded that the decision was right, and did not dissent therefrom. (This paragraph added since I saw the opinion in December.)

But I deny that any one has a vested right in any particular remedy. In 28 Georgia Reports, 350, (Lockett vs. Usry,) our Court say : " If the Legislature see fit to alter the law as to the manner of pleading, either at law or in equity, or in any summary or anomalous proceeding, and the statute takes effect before the defence is made, the party must conform to the new rule. And he cannot complain of having been deprived of a vested right. There is, we apprehend, no such thing as a vested right in remedies. All the Courts say is, that the Legislature cannot so change the remedy as to render it nugatory." This was a case where the proceedings were instituted under the rent laws, and pending the action the " intruder's statute " was passed, and the proceedings were changed so as to conform to the provisions of this statute; the party, say the Court, " must conform to the new rule." See, also, Johnson vs. Kookagey, 23 Ga. R., 184, where the

Aycock, *et al.*, *vs.* Martin, *et al.*

Courts say, "statutes changing a man's remedy have never been held unconstitutional." These authorities seem to me to be conclusive. I think that a "stay law" is not such a retroactive law as the constitution prohibits.

If an apology were necessary for the length of this opinion, it might be found in the importance of the question, and the great and varied interests depending upon its decision. The fact, also, that a majority of the Court are against me tends to make me distrustful of my own opinion. I have, therefore, preferred to let the sages of the law be heard rather than my own individual views. I felt that I could thus give more strength to the views I advocate than by giving simply, in my own language, the reasons which control my opinion in opposition to that of my learned brethren. I have quoted from our law writers very freely, and, to my own mind, have established very satisfactorily the proposition that "a stay law is constitutional."

NOTE.—This opinion, except some slight additions and modifications, was prepared during the summer and fall vacations of 1867. I deem it proper to make this statement on account of what has subsequently transpired.

WALKER, J.