Battle *vs.* Shivers.

LUCIEN N. B. BATTLE, plaintiff in error, *vs.* JAMES A. SHIVERS, defendant in error.

A *fi. fa.* issued on the 12th of April, 1861, on which is no entry by a proper officer to execute and return the same, within seven years from that date, is dormant. The Act of the 30th of November, 1860, and subsequent Acts supending the Statute of Limitations, and the several Acts enacting Stay-laws did not suspend the dormant Judgment Act; that Act is not a Statute of Limitations. WARNER, J., dissents.

Rule against Sheriff. Dormant judgment. Decided by Judge WILLIAM M. REESE. Warren Superior Court. April Term, 1868.

In answer to a rule against the sheriff, he stated that he had $2,032 50 raised by the sale of Curran Battle's property, subject to distribution according to law. Lucien N. B. Battle and A. W. Battle, who brought the rule, claimed the money under a *fi. fa.* in their names as executors, etc. Jas. A. Shivers was the assignee of a *fi. fa.* founded on a judgment older than theirs, it having been issued upon a decree rendered in Warren Superior Court, at its April Term, 1859, and dated the 7th of April, 1859, in favor of Lucien N. B. Battle, *et al.*, for the use of Robert Toombs against said Curran Battle.

The parties were at issue as to who should have said fund, Lucien N. B. Battle and A. W. Battle objecting to Shivers taking it, because, as they averred, his *fi. fa.* was dormant. On the trial, the movants of the rule read in evidence their *fi. fa.*, which issued on the 12th of April, 1861, on a judgment obtained on the second day of said month, which, on the 4th day of December, 1867, had been levied on the property of said defendant, the proceeds of which was the fund aforesaid, raised by sale under said levy. Shivers' attorney then offered in evidence his *fi. fa.*, which had no entry of any officer on it since its said date. It was objected to upon the ground that it was dormant. The Court would not reject it, and the evidence being closed charged the jury that said *fi. fa.* was not dormant. There was a verdict in favor of Shivers, and he took the fund.

Thereupon a new trial was moved for, on the ground that the Court erred in not rejecting said *fi. fa.,* and in his charge to the jury. The Court refused a new trial, and that is assigned as error.

TOOMBS & DUBOSE, for plaintiffs in error.

E. H. POTTLE, for defendant in error.

MCCAY, J.

The sole question in this case is, whether the Acts passed at different times from November, 1860, up to November, 1865, suspending the "Statute of Limitations," suspended also the Acts providing that under certain circumstances judgments shall become dormant. In other words, is the Dormant Judgment Act, in the sense of the several suspending Acts, alluded to, a "Statute of Limitations?" It may be remarked, in passing, that these suspending Acts go into no detail, they all simply suspend the Statutes of Limitations, and in the investigation of the question before us, the defendant in error must clearly be in the right, unless, in some fair and just sense, the dormant Judgment Act can be covered by the words, statutes of limitations.

Much stress has been laid in the argument upon the fact that the codifiers have placed this provision of the law in the chapter devoted to Statutes of Limitations. Code, section 2863. But this argument has but little force, if it be remembered that they have also put the provision of three months after judgment for applying for a *certiorari,* and thirty days from the adjournment of the Court for suing out a writ of error, under this same head. Who would contend for a moment that these provisions were suspended by the suspending Acts? This Court has over and over again, during the existence of the suspending Acts, dismissed writs of error because not sued out in time, nor is it probable that it ever suggested itself to any one that the suspending Acts suspended also these provisions. At best, all that can be said is, that it was the opinion of the codifiers that these pro-

Battle *vs.* Shivers.

visions might fairly be classed under the heading "Periods of Limitations." But the classifications of the Code are not law, nor are they at all accurate. It is probable that the dormant judgment provision was placed here for the reason that the codifiers did introduce a provision in reference to judgments which may fairly be called a statute of limitations, to-wit: that a judgment should not be revived or sued upon, more than three years after it became dormant, and it seemed proper to them, having thus made the period of limitation for suit, dependent upon the dormancy of a judgment, to prescribe in the same section, under what circumstances a judgment should become dormant.

It was said also in the argument that the Act of 1856, known as "Cone's Act," which is entitled "An Act limiting the time in which suits in the Courts of law in this State must be brought, and also limiting the time in which indictments are to be found and prosecuted in certain cases, and for other purposes therein mentioned," (Acts 1856, page 233,) contains also the dormant judgment Act. In our judgment this is not the fact. The Act of 1856 says nothing about dormant judgments. It has a provision, it is true, prescribing that after seven years, without an entry, a judgment shall be presumed to be satisfied, but, as will appear hereafter, this is entirely a different thing from the provision for dormancy. In a very fair sense, a provision that a judgment shall be presumed satisfied may be called a "Statute of Limitations," since a judgment thus situated cannot be revived nor sued upon.

It may be remarked, too, that this Act of 1856, by its very title, "for other purposes," intimates that the Legislature well understood that the Act covered other things than Statutes of Limitation. The language of this Court in several cases has been referred to as sustaining the view that the dormant judgment Act may be fairly covered by the words "Statutes of Limitation." In these cases this Court speaks of this Act as "limiting" the operation of the judgment, of the "running of the Statute," of the "period of limitation," etc., etc. It would be a very severe criticism to require

Battle *vs*. Shivers.

a Judge never to use language, which though applicable to the case in hand, might, by perversion, be made to apply to a wholly different case. The dormant judgment Act does "limit" the operation of a judgment; it does fix a period beyond which, without an entry, it shall not be enforced, and it is not an improper use of language to speak of the Act as "limiting" the judgment, or of the period of limitation, etc., etc. The word limitation has a definite, philological meaning, and is applied to various other things besides actions at law. Any act which fixes a period within which a thing shall be done, on pain of losing a right, "limits" the period within which the thing shall be done. In this sense the law prescribing within what time an appeal shall be entered, an execution stayed, a bill of exceptions filed, a deed or mortgage recorded, a lien entered up, a child's part chosen in *lieu* of dower, and many other Acts of like character, are laws "limiting" the period within which the things shall be done, and it would not be improper language, in speaking of any one of them, to say that the law "limited" the period within which, etc., etc. It can hardly be contended that by the words "statutes of limitation" in the Acts referred to, the Legislature meant all Acts limiting the time within which anything shall be done on pain of losing a right, since such a construction would include the Registry Acts and the other Acts to which we have referred, as they would all come clearly within such an intent. It is plain, therefore, that the words "Statutes of Limitation," as used in these Acts, are to be construed reasonably and as they are used by lawyers, and not as covering all Acts limiting a period within which certain acts shall be done, on pain of losing a right. The phrase "statute of limitation" is a very familiar one. Very few persons can be found, at all conversant with business, who would not at once understand it. Whole books have been written upon it. Digests and indexes make it a separate subject, and there is hardly a law book in which it does not occur. And I venture to say, that, in the whole range of legal literature, these two words, taken together, can not be found, save with one meaning, to wit: that of "Acts limiting

the time within which proceedings shall be commenced in a court of "justice." The word "limitation," used by itself, is variously applied, but the words "statutes of limitation" have always this definite meaning. At Common Law there was no limitation of actions; but in the reigns of Henry VIII and James I, certain statutes upon this subject were passed, and in England and America these words "statutes of limitation" have for more than two hundred years been applied to that series of Acts which limit the period within which actions shall be brought or proceedings commenced in a court of justice. These Acts are all based upon two ideas: First, that the defendant has, by lapse of time, lost the evidence of his right, that his witnesses may have died, his papers have been lost or destroyed. (For it has always been held that he may at any time waive the operation of the statute by acknowledging the plaintiff's right.) Secondly, that the plaintiff is to blame for not sooner bringing his action, since, if he be under any disability to sue, as an infant, insane, *covert*, imprisoned, or the like, the statute does not run against him. In other words, these Acts, *all*, are for the regulation of the rights of the plaintiff and defendant, and turn upon certain presumptions growing out of lapse of time, which may always be rebutted by the acknowledgment of the defendant on the one hand, or, on the other, by a disability of the plaintiff to sue.

"Statutes of limitations" are, then: first, Acts limiting the time within which actions shall be brought; and secondly, they are based upon presumptions arising from lapse of time, which may be rebutted by showing an acknowledgment by the defendant, or proving the plaintiff under a disability to sue. Acts regulating proceedings at law, as the time limited for entering an appeal, or staying an execution, or serving a notice, and such like, and Acts regulating the rights of two persons against a third, as to preferences between them, though they limit the time within which certain acts shall be done, do not come within these ideas of statutes of limitation. They are not Acts limiting the time within which actions or proceedings shall be commenced in a court of justice, nor are

they based upon the presumptions arising from lapse of time. They are for public convenience, and for the purpose of giving to third persons reasonable notice of Acts affecting their conduct.  If one should fail to appeal within the four days, or to enter his stay of execution within the proper time, or to file his bill of exceptions, as the law requires, at law his rights would be gone; so, too, if a widow fails to elect within the twelve months, or the grantee or mortgagee fails to record his deed, or the mechanic to enter his lien, no excuse of disability, nor acknowledgement by the maker of the deed, will excuse the failure.   These Acts are not based upon presumptions which may be rebutted, as are "statutes of limitation," but are positive requirements of law, intended for public convenience, or for the regulation of the rights of third persons, by requiring proper and reasonable notice.

In our judgment, the Dormant Judgment Act fulfils neither of the requisites of a "statute of limitations."   It does not limit the time within which proceedings shall be commenced in a court of justice, nor is it intended to protect the defendant by enforcing the presumptions arising from lapse of time. On the contrary, it is for the protection of the rights of third persons, and is based upon the justice of requiring the plaintiff in a judgment to let innocent purchasers of the defendant's property, and other creditors, know, once in seven years at least, that he claims his judgment as a subsisting one. The essential characteristics of a judgment are not at all altered by its dormancy.   It is still a debt of record, it is still the legal declarations of the rights of the parties; it still imports verity.   As against the defendant, it is not even presumed to be satisfied, since it is revived as a matter of right, unless the defendant show good cause to the contrary.   Indeed, as against the defendant, its dormancy only affects a judgment, so far as that it cannot be enforced by execution, until he has been furnished with an opportunity to show that it is not satisfied.

I am aware that it is often said that a dormant judgment is presumed *prima facie* to be satisfied; but in favor of the defendant, even this is not so.  A *prima facie* presumption is

Battle *vs.* Shivers.

one requiring at least some proof to rebut it.   But on a *scire facias* to revive a judgment, the burden of proof is upon the defendant.   The record only yields so far as that it permits the defendant to prove satisfaction.   He is called on to *show cause,* and unless he does this, the judgment is revived.   This is but a trifling advantage to the defendant, one that, even by our law, can be removed in twenty days.   It is done by motion at the first term after service, and without the intervention of a jury.   The judgment is taken for true, and the burden of proof is upon the defendant.   Code, section 3550. As to third persons, purchasers of the defendant's property, and other judgment creditors, a very different state of things exists.   A dormant judgment is presumed satisfied.   It has lost its lien.   Purchasers from the defendant, and other judgment creditors, are preferred to it.   As to them, it is as though it were satisfied.

By the common law, judgments took lien on the property of the defendant from their date, but unless the judgment was renewed, upon the Court roll, within the year they became dormant, in a year and a day, and lost their lien.   They were still good judgments, but they had no lien.   They were like judgments in equity, rules absolute against the sheriff, and other judgments not capable of being enforced by levy and sale, until the defendant was called upon to show cause why this lien should not re-exist, why the judgment should not be enforced.   Unless execution issued in a year and a day, the judgment became dormant, and execution could not issue without *scire facias.*   But if an execution issued, though it was not returned, yet if, from term to term, the plaintiff caused an entry to be made on the roll, " *vice comes non misit breve,*" the judgment still subsisted as an active judgment, kept its lien, and might be levied.   Tidd's Practice, 1003, 1106; Bacon's Abr. Tit., *Sci. Fa.,* C. 1; Welden's case, 1 Keb., 159; 7 Mod., 8; 12 Mod., 377; Lewis vs. Smith, 2 Ser., and Rauls.   Obviously while one object of these rules was to prevent a surprise to the defendant, yet the paramount intent was to require the plaintiff constantly to renew, to purchaser and other judgment creditors, notice

that his judgment was unsatisfied. If he neglected this, if he failed to take out his execution, or if execution did issue, and he failed to keep up the notice by the regular entry on the roll, *vice comes non misit breve*, as to purchasers, his judgment was presumed satisfied, and, as to younger judgments, it lost its rank. As to the defendant, however, it was still a good judgment, but no process could issue to enforce it, until by *scire facias* the defendant was allowed an opportunity to show it satisfied. Tidd's Prac., 1103, 1106. And such was the law of Georgia until 1811, when it was provided that "executions should be of full force until satisfied, without being obliged to be renewed on the Court roll from year to year, as heretofore practised." Prince's Digest, 436. In the previous year (1810) the Legislature had made it the duty of the sheriff to keep an execution docket, and enter thereupon all his acts and doings as to every execution put into his hands, and to file that docket in the Clerk's office, on or before the first day of the term, which docket shall remain in said office, for the inspection of all parties concerned. Act of 1810, Prince's Dig., 436. It was doubtless thought by the Legislature that this Act of 1810 made the English practice of an entry on the Court roll by the plaintiff's counsel unnecessary, and hence the Act of 1811. The sheriff's docket, with its entries of his acts filed for public inspection, answered, as it was thought, all the purposes, and perhaps was better than the old law. But very soon great evils arose, calling for new legislation, and the Act of 1822 was passed. Prince's Dig., 452. This Act, as explained by the Act of 1823, Prince's Digest, 458, was the law of this State on this subject until the adoption of the Code.

Under the Act of 1811, even with the precautions provided by the Act of 1810, in requiring the sheriff to keep and file in the Clerk's office a docket of his actings, great frauds were practiced. The title of the Act of 1822, as to this subject, is "To prevent a fraudulent enforcement of dormant judgments," and the preamble recites that "dormant judgments are collusively kept open or made the instruments of fraud, and often operate oppressingly on vigilant and *bona fide*

Battle *vs.* Shivers.

creditors," and it, as explained by Act of 1823, enacted that "all judgments hereafter rendered, on which no execution shall issue, or on which execution, if sued out, no return shall be made within seven years from the date of the judgment, shall be void: *provided,* that nothing in this Act contained shall prevent the plaintiff from renewing such judgment in cases when by law he would be otherwise entititled to do so, but the *lien* of such revived judgments on the property of the defendants shall operate only from the date of such revival."

Who can read this brief sketch of the history of the law on the subject without coming irresistibly to the conclusion that the dormant judgment law was intended, not so much to regulate the rights of the plaintiff and defendant, as to protect third persons? Indeed, the preamble to the Act of 1822 implies that the object was to prevent the plaintiff and defendant, by fraudulent collusion between themselves, from getting the advantage of innocent third persons. The point of the Act is, that the plaintiff, once in seven years, at least, shall so use his judgment as that the proper officer has a return to make to the Court, an entry to put upon the *fi. fa.,* transcribed upon the docket, filed at the first day of the term in the Clerk's office, there to remain (Act of 1810) for the inspection of all parties concerned. Let it be remembered, too, that the thing required to be done was to have a return upon the execution. Not as has been argued, that the plaintiff must proceed with his execution, do something. The words are, "a return" by the proper officer, etc. Now, anything is a "return" which is a reply to the mandate of the Court requiring the officer to make the money. An entry of a levy of payment, satisfaction, are each returns, and show action. A return of no property, of the *dismissal of a levy,* of the postponement of a levy, have each been held by this Court as sufficient. And doubtless, any entry by the sheriff, which would be a reply to the mandate of the Court contained in the writ, would be sufficient, as an entry that the defendant had resisted the execution of the process, or that the plaintiff had ordered it delayed, anything which the

sheriff might lawfully return. The point of the Act is, that there shall be a return, which placed on the docket and filed in the Clerk's office for public inspection, shall stand in the place of the entry *vice comes non misit breve,* and be a notice to purchasers and junior judgment creditors that the plaintiff *claims* his judgment to be a subsisting one. The main, leading idea is not to protect the defendant, not to use for his benefit the presumptions from lapse of time, but to fix, by positive law, a rule that once in seven years notice shall go to all that the plaintiff claims his judgment to be subsisting. This law is for the benefit of third persons. No sort of acknowledgement by the defendant, even if in writing, will prevent the operation of the Act, and no sort of disability on the part of the plaintiff will excuse the non-compliance with its provisions. It stands on the footing, and has the same object, as the Registry Acts, and other Acts of like character, " limiting the time within which a thing shall be done," but intended not as a statute of repose between plaintiffs and defendants in courts of justice, but as a positive rule of law, fixing an arbitrary period within which certain acts shall be done, as notice to third persons whose rights as to the same subject matter or person may be affected. Such Acts, all, it is true, " limit" the period within which a thing shall be done, but they do not at all come within the meaning of the well known phrase, " Statute of Limitations," and nothing would be more absurd than to suppose that it was the intent of the Legislature to suspend such Acts. There has been nothing in the state of the country, nothing in any of the laws in force, which would make it at all difficult for a plaintiff to comply with this law. An entry by the sheriff that a levy could not be made because of the public enemy, because of some obstruction put in his way by the defendant, or by the army, or that some statute was in force prohibiting his action, or a simple entry that the plaintiff had directed him not to proceed, any return by the sheriff, informing the Court that he had made the money, or giving a good reason why he had not, would comply with the statute. The intent of the law is not repose; the plaintiff may keep his judg-

ment enforceable by a simple direction to the sheriff, once in seven years, not to proceed with it, provided that it is put by the sheriff in the shape of a return. What sort of repose is this? making a levy and dismissing it, taking the *fi. fa.* to a distant county, where the defendant does not live, and causing the proper officer there to make a return of no property to be found? What sort of *proceeding* is this? And yet this Court has held such a return sufficient. When such a return goes upon the sheriff's docket, is filed in the Clerk's office; purchasers may see that the plaintiff still claims his judgment to be open. But in what way it can be a "proceeding" seems hard to discover. 18th Ga. Reports, 746, *Neal vs. Lamar.* So completely is this Act intended to regulate the relative rights of third persons, and thus come under the classification of laws relating to notice, and not to "Statutes of Limitations," that this Court has held that though the Act is general, "all judgments," yet it does not apply to mortgage *fi. fas.*, since their lien is not fixed by the judgment, but by the Registry Act. *Butt vs. Maddox,* 7 Ga., 495.

We conclude, therefore, that the dormant judgment law is not a "statute of limitations," that it is not based upon the presumptions arising from lapse of time, but that it stands upon the footing of those Acts which fix a period within which acts shall be done, in order to regulate the rights of two persons with reference to a third, as the Registry and Lien Laws, and that it was not suspended by the Acts suspending the Statutes of Limitations.

The Act of March 6th, 1866, differs somewhat from the other suspending Acts, as it suspends "all Statutes of Limitations relating to liens affected by this Act." Admitting, for argument's sake, that by *this* Act the Legislature probably intended to suspend the Dormant Judgment Act, (though the language is very inappropriate for the purpose,) the reply is, as we think, conclusive that this Act has been solemnly pronounced by this Court null and void, as in violation of the Constitution of the United States. It is immaterial whether the Court was right or not. It is a judgment by

which we are bound under the Constitution and laws of this State.

The Act of March 6th, 1866, expressly only suspends the Acts referred to, so far as they are affected by that Act. Now this Court has held that the Act of March 6th, 1866, never was the law; it was void; it had no force; it effected nothing. *Aycock vs. Martin*, 37 Ga., 124.

The strange doctrine has been advanced here that even unconstitutional law is good while it stands; that the citizen may act upon it with impunity, is perhaps true, but that he can acquire rights under it, as to third persons, or that he can be excused, by virtue of it, from duties due to others, so as to save rights to himself dependant upon these duties, is not true. A Court might hesitate to punish its officer for failing to ignore an unconstitutional law, because in such cases it acts in its discretion, but it would be absurd to insist that a man can acquire rights under a void law. This very point was ably discussed before the Supreme Court of Pennsylvania, and decided adversely to the claim of such vitality for a void law. In that case, the Supreme Court of the State had declared a certain statute constitutional; while this decision stood unreversed, the Statute of Limitations was running against a claim which Carey had against Hudson. Subsequently the Supreme Court of the United States reversed the decision of the State Court, and it was contended that whilst the decision stood, as it was the law *de facto* of the State, and it would have been folly for Carey to sue, the statute did not run. But after solemn argument the Court decided otherwise. Hudson vs. Carey, 11th Ser. & Rawle. Every man must take notice, at his peril, as to what is the law.

The Constitution is irrepealable, and any law in violation of it is void—is null; rights *cannot* grow up under such a law. The right which A gets under the Constitution, cannot be put aside by rights acquired by B under a void law. The doctrine is simply absurd, and confounds what a kind-hearted Judge might do in fixing a penalty with what the same Judge would be bound to do in deciding as to the rela-

Battle *vs.* Shivers.

tive rights of two persons, one claiming under the law, and the other under a mere blank form of words.

The argument in favor of the plaintiff in error, based upon what is claimed to have been the common understanding, does not, it seems to me, merit deliberate notice. The meaning of so well understood a phrase as the " Statute of Limitations," when used in a statute, and when that meaning is sought for by a judicial tribunal, is not to be ascertained by the general understanding. The use of it, in law books and statutes, and its meaning, as used by persons acquainted with the science, of which it forms a part, is the only meaning that a Court ought to notice. Nor is it, in my judgment true, that any large class of any profession, much less of the lawyers, have, in the past, considered the dormant judgment Act a statute of limitations. It is very strange that, though dormant judgments and the rules by which that dormancy is determined and statutes of limitations are both phrases which, for centuries, have been in familiar use in law books and by lawyers, there is not to be found in any Digest, Index, or Treatise, an instance in which they are classed together. The several objects sought by the statutes in reference to the two things are wholly different; they are based on different principles, and have relation to different classes of persons.

It is, too, a significant fact, that, in the trial of this case below, although General Toombs, Judge Stephens, Mr. Pottle, and other distinguished gentlemen were engaged, and though no less a jurist than Judge William Reese was upon the bench, it does not seem to have occurred to any of them that the Act of November, 1860, or any of the suspending Acts up to that of March 6th, 1866, had any bearing upon the case. The thought that the dormant judgment Act was covered by the simple phrase, " Statute of Limitations " was not mentioned, as we learn from the record in the Court below. It was reserved for the astuteness of counsel from another circuit to suggest the idea. We admire their ingenuity and the fertility of their minds; but this single fact is a reply, and a conclusive one, to the claim that the general

sense of the people of this State, including those learned in the law, has included the dormant judgment Act among "Statutes of Limitations."

Another very singular suggestion has been made in favor of the plaintiff in error. It is said that by section 1935 of the Code, creditors are to be favored, and that laws are to be construed so as to aid them in attaining their rights. Very true. But what has that to do with this case? Here are two creditors, and the question is, which is to be preferred? The view of the law we have taken has but very small reference to the relations of debtor and creditor. The questions which arise under the dormant judgment Act are almost exclusively between creditors and innocent purchasers, or between one creditor and another, and nothing is better settled than, that innocent purchasers are to be favored; vigilant creditors, too, are to be preferred to those who lie by, to trap the unwary, and who sleep, in slothfulness, until some active rival flushes the game, when they are very ready to be in at the death.

It is not necessary in this case to decide, whether this judgment can be revived. We are inclined to think it can; at any rate, we are of opinion that any statute limiting the time within which it should be revived, would be a Statute of Limitations, and would be covered by the Acts suspending those statutes.

Judgment affirmed.

BROWN, C. J., concurring.

1. By section 2683 of the Code, it is declared that, "no judgment hereafter obtained in the Courts of this State, shall be enforced after the expiration of seven years from the time of its rendition, when no execution has been issued upon it; or when execution has been issued, and seven years have expired from the time of the last entry upon the execution, made by an officer authorized to execute and return the same, such judgments may be revived by scire facias, or be sued on within three years from the time they became dormant."

The latter portion of this section, which limits the period within which a dormant judgment may be revived by *scire facias* or action, is, in the legal sense, a statute of limitations, and is properly so classed, as it bars all right of action on the judgment, if proceedings are not commenced within three years after the judgment becomes dormant, by persons laboring under no legal disability. It puts an end to litigation, and is a statute of repose.

But the portion of said section which relates to the lien of judgment, is not, in any legal sense, a statute of limitations, and was no more suspended by the Act of 1860, or the subsequent Acts suspending the Statute of Limitations, than a mechanic's lien, which he may enforce, on condition that he commence proceedings within a limited time. Taken in connection with section 3525, it imposes certain conditions on a plaintiff in judgment, upon compliance with which he may maintain his lien. These conditions are: in case the defendant has sold his property to a *bona fide* purchaser, for a valuable consideration, who is in possession, that the plaintiff must have a levy made on the property, if personal within two years, if real within four years, or the lien is discharged. And if he fails to have an execution issued within seven years from the date of the judgment, or after the execution has issued, if he fails to have an entry made upon it by the proper officer for seven years, he loses all lien upon the property of the defendant, no matter in whose hands it may be. But in such case, the right is not barred, the judgment still lives, litigation is not at an end—there is no repose. The plaintiff may at any time within three years revive the dormant judgment, by the proper proceeding, and restore it to all its vitality and vigor, with lien upon the property of the defendant from the date of its renewal, and by having the proper entry made upon it once in every seven years he may keep it, in life, for an indefinite period of time, without any limitation whatever.

2. It is no statute of limitations, in the proper legal sense, because none of the disabilities which stop the running of the Statute of Limitations in any way affect the condition

upon which the lien is retained. If the person having a right of action dies, the Statute of Limitations stops running against his estate, till representation is taken upon the estate, if the time does not exceed five years. But if a plaintiff in judgment dies the next day after it is rendered, and there is no representation on his estate during the whole period, the judgment is still dormant, and the lien lost, if the proper entry is not made within seven years. The same rule would apply, in case the plaintiff in judgment is a married woman, an infant, an idiot, insane, or imprisoned, all of which are exceptions which stop the running of the Statute of Limitations.

3. But it is insisted that the Act of 1866, known as the " Stay-law," expressly suspends the Statute of Limitations as to liens. So it does. But what liens? All liens, says the statute, *affected* by that Act. This Court, whether its judgment was right or not, has declared the Stay-law *unconstitutional and void.* It is very clear that the Legislature only intended to suspend the Statute of Limitations as to liens, as long as the Stay-law remained legally in force, and no longer. Under the ruling of this Court, the Stay-law was never legally in force for a single day. It therefore never affected any liens, and as the Statute of Limitations was only suspended as to liens affected by it, and none were affected by it, the statute was suspended as to none. The Stay-law having been declared *null* and *void,* it is, in law, as if it had never been passed, and creditors are no more entitled to claim legal rights under it now, than debtors were when it was brought before this Court and set aside in the interest of creditors.

See dissentient opinion of WARNER, J., in *Chapman vs. Akin, ante.*